**Benjamin P. BECKER, Sr., et al., Plaintiffs,**

v.

**SIMPSON BUILDING SUPPLY COMPANY, et al., Defendants.**

Civ. No. 85–1893.

United States District Court, M.D. Pennsylvania.

Nov. 27, 1987.

Donald H. Brobst, Edward A. Monsky, Wilkes–Barre, Pa., for plaintiffs.

Robert M. Goldich, Jonathan D. Wetchler, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

### Introduction

This is an action by former employees of Simpson Building Supply Company ("Simpson Building") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, for severance pay arising out of the sale of the facility where they were employed to the Hudson Building Supply Company. Plaintiffs' claim that the sale of the facility entitles them to severance pay despite the fact that they continued their position at the facility with Hudson without any period of unemployment.

### Procedural History

On November 27, 1985, Plaintiffs originally filed this action in the Luzerne County Court of Common Pleas alleging that Simpson's failure to pay severance benefits violated the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.* and breached an agreement with its employees. Simpson removed the case to this Court asserting that Plaintiffs' complaint pleaded an action for welfare benefits arising exclusively under ERISA. On July 30, 1986, this Court granted Defendants' motion for a non jury trial. On October 7, 1986, Plaintiffs filed an amended complaint which withdrew all of Plaintiffs' state law claims. The amended complaint asserts that Simpson's decision not to pay severance benefits violated ERISA.

This matter is currently before the Court upon cross motions for summary judgment filed by the Plaintiffs and the Defendants. To facilitate our review of this matter, the parties, after a full opportunity for discovery, entered into the following stipulation of facts.

### Stipulation of Facts

1. Plaintiffs are former employees of Defendant, Simpson Building. Plaintiffs worked at Simpson Building's Wilkes–Barre, Pennsylvania distribution center.

Fourteen of the Plaintiffs were salaried employees, and twelve of the Plaintiffs were hourly employees on the final date of their employment with Simpson Building.

2. Simpson Building is a wholly owned subsidiary of Simpson Timber Company ("Simpson Timber"), a privately owned timber, wood and paper products company headquartered in Seattle, Washington.

3. In the early 1980's, Simpson Building operated ten regional distribution centers at the following locations: Wilkes–Barre, Pennsylvania; Louisville, Kentucky; Wichita, Kansas; Elkhart, Indiana; St. Charles, Illinois; Shelton, Washington; Arcata, California; Kirkland, Washington; Cerritos, California; and San Clara, California. The distribution centers were wholesale outlets responsible for the distribution of timber products produced by Simpson Timber and others to customers.

4. In the early 1980's Simpson Building shut down the Louisville, St. Charles, Shelton, and Arcata facilities. Employees who retained jobs with Simpson did not receive severance pay. Salaried employees who lost their jobs as a result of plant shutdowns received severance pay based on a uniform schedule applicable to employees of Simpson Timber. Unionized hourly employees who lost their jobs as a result of the plant shutdown received severance pay based on the outcome of collective bargaining negotiations between Simpson Building and their union representatives. Non-unionized hourly employees who lost their jobs as a result of the plant shutdowns received severance pay of one week's pay for each year of service.

5. As of September, 1984, the most recently published version of Simpson Timber's severance pay policy was that contained in the 1982 version of the policy appearing in the Simpson Management Guide.[1]

6. Between 1982 and September, 1984, Simpson Timber's management made severance payments to salaried employees on a slightly different schedule, not on the basis of the schedule of benefits set forth in the Management Guide.[2]

7. In late 1982 or early 1983, Simpson Building's management decided to sell the three remaining Eastern distribution branches of Simpson Building, consisting of the Wilkes–Barre, Kansas, and Indiana branches.

8. Albert W. Fortener was the Corporate Labor Relations Manager for Simpson Timber and the individual who had the responsibility of providing personnel services to Simpson Building at this time.

9. On July 13, 1983, Fortener wrote a memorandum to Larry Fleming, then Simpson Building's Operating Manager, containing his recommendations with regard to severance pay and other matters pertaining to benefits to employees affected by the possible sale of Simpson Building's Eastern branches.[3]

---

**1.** Simpson's severance compensation for salaried employees reads as follows:

*Purpose and Scope.*

1.01 Salaried employees who are curtailed as the result of a permanent or extended period of reduction in salaried positions due to business conditions, plant closure, or departmental reorganization will be granted severance pay to provide a period of salary continuance following termination.

1.02 The duration of the severance pay is based on the employee's length of service with the company.

1.03 Employee status and certain employee benefits will be continued during the severance pay period.

*Eligibility*

1.04 Salaried employees curtailed due to elimination of their function or operation due to position consolidation and through no fault in performance are eligible for severance pay.

1.05 Employees scheduled to be curtailed who voluntarily terminate prior to curtailment by the company will forfeit all severance pay rights unless an earlier separation date is approved by the department head.

1.06 Curtailed employees returned to company positions during their severance pay period will be reinstated for all employee benefits and will forfeit the unpaid balance of their severance pay.

*See* Doc. 36, Exh. 3, page 1.

**2.** Our review of the revised schedule indicates that the revised schedule slightly enhances the severance pay allowances for employees with over 16 years of service with the company.

**3.** The text of Mr. Fortener's recommendation contained in the memorandum reads as follows:

SALARIED EMPLOYEES

All employees terminated by Simpson as a result of the sale and not offered employment

10. Simpson Building did not sell any of its branches in 1983 or the first half of 1984.

11. On July 2, 1984, Fleming wrote a memorandum to Furman Moseley, Simpson Timber and Building's president, incorporating Fortener's recommendations with regard to severance pay and other matters pertaining to employees' benefits and to employees affected by the sale of the Eastern branches of Simpson Building. Moseley approved Fleming's recommendations.[4]

12. On September 8, 1984, Simpson Building entered into an agreement of sale with Hudson Building Supply Company ("Hudson"), a corporation unrelated to Simpson for the sale of the Eastern branches.

13. On September 16, 1984, Simpson Building completed the sale of the Wilkes–Barre facility as well as the facilities in Indiana and Kansas to Hudson.

14. Simpson did not at any time prior to the sale to Hudson tell any of the Plaintiffs that they would be eligible for severance pay if the branch was sold and the employees retained by the purchaser.

15. In connection with the sale of the Wilkes–Barre facility to Hudson, Fortener and Fleming traveled from Seattle to Wilkes–Barre to meet with the hourly and salaried employees from the Wilkes–Barre facility.

16. At this meeting, both hourly and salaried employees were advised that since they would be employed by Hudson, they would not be eligible for severance pay. Fortener explained the reason why the employees were not eligible, based upon the purpose of the severance policy. Simpson did not inform Plaintiffs in writing that they would not be paid severance pay at the time of the sale of the Eastern branches to Hudson.

17. Hudson hired all but one of the individuals employed by Simpson at the Wilkes–Barre facility. Joseph Gallagher, a salaried employee, was the only Simpson employee not hired by Hudson at the Wilkes–Barre facility. Simpson paid Gallagher four weeks severance pay.

18. Hudson did not initially establish a pension plan or 401(k) Plan for the Plaintiffs. Several of the Plaintiffs were not vested in their pensions under Simpson Timber's pension plan and faced loss of all pension benefits as a result. On or about April 9, 1985, Simpson advised Plaintiffs that it would credit their service at Hudson for vesting purposes under the Simpson Pension Plan. As a consequence, Plaintiffs John Giarrantano, Frank Sanfilippo and Kenneth F. Gerlach, have now vested in their Simpson pensions as a result of service with Hudson, and any plaintiff not previously vested in his or her Simpson pension prior to the sale could similarly vest in the Simpson pension as a result of

---

with the purchaser will be given full severance pay and benefit options.

Employees offered employment by the purchaser at substantially the same or better positions in pay will not be granted severance pay or benefits if they decline such offer.

Employees who accept offers of employment and are curtailed or terminated through no fault of their own within thirty days of employment will receive all severance benefits.

Employees who decline offers of employment requiring substantial pay reductions or lesser positions may receive severance benefits upon approval of the general manager. SBSCO.

. . . . .

HOURLY EMPLOYEES

Severance benefits should be the same as we use for Louisville and St. Charles—one week for each year of service paid only to those employees not offered other employment with the purchaser with a minimum of four weeks.

. . . . .

The above recommendation is somewhere in the middle of what other timber companies do with regard to the sale of facilities. Some companies grant severance to all employees regardless of employment with the purchaser, while others don't grant severance if employment continues.

Figures developed in April indicate maximum cost liability to provide full severance to 100% of the work force to be approximately: Wichita —$220,000; Elkhart—$150,000; and Wilkes–Barre—$210,000;

See Doc. 32, Exh. 5.

4. It is notable that Mr. Fleming indicated in his memorandum that the maximum cost to the company if everyone were paid full severance benefits would be approximately $600,000.00. See Doc. 36, Exh. 6.

ten years of combined service with Hudson and Simpson.

19. As a result of the sale, Simpson agreed to pay ¾ of the salaried employees bonuses at the end of 1984 with Hudson paying the remaining share of the bonuses. The bonuses were to be calculated at the end of the year and were based on the branches' profitability. At the end of 1984 bonuses were paid to nine employees.

20. In late 1984, Hudson closed the Wichita, Kansas branch and terminated all but two of its employees. Simpson rehired those terminated employees and immediately curtailed them with full severance pay. Simpson did not pay severance to the two employees retained by Hudson after the closing of the Wichita facility.

21. Two of Simpson Building's former employees at its Elkhart, Indiana distribution center were terminated by Hudson on November 1, 1984. Simpson rehired these two employees and curtailed them with full severance pay.

22. Plaintiff George Turner, as branch manager of the Wilkes–Barre facility, was assigned a copy of the Simpson Management Guide. Salaried employees were made aware of the existence of the guide by way of a reference made in the salaried employees handbook. Upon request, the guide was available to other salaried employees.

23. Simpson Building distributed a document entitled the "Simpson Building Employees' Benefit Handbook" to hourly, non-bargaining unit employees.

24. None of the Plaintiffs received any offers of employment from other employers while they were working for Simpson in the time period immediately preceding the sale to Hudson.

25. Plaintiffs were no longer employed by Simpson Building as of September 16, 1984, when Simpson Building sold its Eastern branch operations to Hudson pursuant to the agreement of sale referred to in Paragraph 12 above.

26. Simpson Building no longer conducted operations in Wilkes–Barre, following the sale of that branch to Hudson.

27. Plaintiff did not cease being employees of Simpson Building due to any fault in their job performance.

28. In 1984, there was no reference in Simpson's IRS Form 5500 filing to severance benefits.

29. The Simpson Timber Management Guide contains the policies and practices applicable to salaried employees of Simpson Building. The management guide cannot be changed without the approval of either the president or chairman of Simpson Timber.

*Additional Assertions of Defendants*

In addition to the stipulated facts listed above, the Defendants indicate that a substantial factor in its willingness to sell to Hudson was Hudson's commitment to operate, not liquidate, the distribution centers. Supposedly this provided Simpson with a way of preserving the jobs of its employees as well as preserving a market for its products. Hudson allegedly offered each of the Plaintiffs employment under substantially the same terms and conditions of employment as provided by Simpson and those offers were accepted. Plaintiffs did not miss one day of work or lose any pay as a result of the transfer of ownership of the Wilkes–Barre facility.

Defendants maintain that their severance policy did not provide for severance pay for employees who were retained by a successor employer when a facility was sold as an ongoing operation or otherwise terminated other than by way of curtailment. Simpson used the term "curtailment" to denote a permanent elimination of a position which deprived an employee of income. Defendants maintain that non-economic termination such as those resulting from a sale of a facility as a going concern was not generally reported as curtailments on its employee records.

With regard to hourly employees, Simpson alleges that its written severance policy provided no entitlement whatsoever to those particular employees. However, Simpson Timber indicates that it accorded substantial autonomy to the operating units to establish employment policies ap-

plicable to hourly employees. Despite the absence of a severance pay policy for hourly employees, Simpson Building did, as a matter of practice, pay severance to non-union hourly employees if curtailed as a consequence of a plant shutdown.

Finally, Simpson recognizes that it did not strictly comply with ERISA's procedural reporting and disclosure provisions. However, Defendants maintain such failure is immaterial to a determination of the Plaintiffs' rights since Simpson did not actively conceal its severance policy; Plaintiffs were in fact advised of the severance policy; Simpson consistently responded to any demand for information regarding its severance policy; and the Plaintiffs suffered no detriment by the Defendants' failure to follow ERISA's strict notice requirements.

### Additional Assertions of Plaintiffs

Plaintiffs assert that the primary factor in the Defendants' willingness to sell its distribution centers to Hudson involved its desire to avoid a substantial outlay in severance benefits for its employees which it had estimated at from $580,000 to $600,-000. Plaintiffs note that the agreement of sale between Simpson and Hudson did not provide for any obligation on the part of Hudson to offer continued employment to the Simpson employees. Plaintiffs maintain that an inner office memorandum evidenced that Simpson promised Hudson it intended to make full severance benefits to any employee who accepted offers of employment with Hudson, but who were severed through no fault of their own within thirty days of employment with Hudson. Plaintiffs further state the Defendants extended the thirty day period to a ninety day period for the allowance of severance pay.[5]

Plaintiffs dispute Defendants' assertion that the term "curtailment" in the Simpson Management Guide only refers to a permanent elimination of a position with deprives an employee of income. To the contrary, Plaintiffs maintain that they were "curtailed" within the meaning of the Simpson Severance Compensation Policy since it is uncontroverted that the Plaintiffs' function with Simpson was eliminated due to no fault in their job performance and that such a situation specifically falls within the purpose and scope of Simpson's severance policy.

Plaintiffs admit that following the sale, Hudson hired all of the Plaintiffs without any immediate change in their job classification, monthly salary or rates of pay. However, Plaintiffs, George Turner and Kenneth Gerlach, received salary cuts from Hudson on or about March 1, 1985 when their compensation scheme was altered from a straight salary to a salary plus incentive formula.[6]

In addition, the Plaintiffs point out that since the sale to Hudson there has been a reduction in many employee benefits, including a less comprehensive medical, life, and dental insurance plan; a less attractive severance pay policy; and a slight reduction in vacation and holiday time.

Finally, the Plaintiffs contest the Defendants' assertion that the severance pay policy only applies to salaried employees. Plaintiffs maintain that a severance policy is applicable to hourly employees in the same manner that it is applied to those employed on a salaried basis.

### Summary Judgment Standard

As the parties suggest, this matter is currently ripe for disposition on summary judgment. Summary judgment may be granted where there are undisputed facts

---

5. Our review of the depositions and the file as a whole illustrates that Simpson's policy at the time of the sale to Hudson entitled salaried employees to severance pay if their employment with the successor was terminated through no fault of their own within thirty days. Hourly employees, on the other hand, were not included in this "extension" policy. Instead, the only evidence presented to the court showed hourly employees were granted severance pay only when "those employees [were] not offered other employment with the purchaser." *See* Doc. 32, Exh. 5. It further appears that any deviation from this policy occurred on a case-by-case basis.

6. Defendants argue that whatever changes that were made to the compensation of Turner and Gerlach in March of 1985 are irrelevant to the determination of their eligibility for severance pay in September, 1984.

from which only one conclusion may reasonably be drawn. *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). The parties seem to agree that there is no significant dispute of facts in the instant case, instead there are only disputes as to the weight certain facts are to be given.

*Scope of Review*

Throughout this proceeding there has been a considerable dispute as to the proper scope of review that we should apply in reviewing Simpson's decision not to afford the Plaintiff's severance pay. Until recently, the clear weight of authority under ERISA was for the courts to apply the arbitrary and capricious standard when considering challenges to an administrators' denial of benefits. Recently, however, our court of appeals changed the standard to be applied in our circuit in a situation as presented here. *See Bruch v. Firestone Tire & Rubber Company*, 828 F.2d 134 (3d Cir.1987), *reh'g denied*, No. 85–1893 (3d Cir. filed Sept. 25, 1987).

In *Bruch*, the plaintiffs worked for an employer which had as part of its compensation package a termination plan which provided severance pay for employees who were released because of a reduction in work force. The employer sold the division that the plaintiffs worked for to a successor corporation. In doing so, the employer terminated the plaintiffs' employment and they were immediately rehired by the successor corporation. Plaintiffs requested termination pay pursuant to the termination pay plan, arguing that the sale of the division constituted a "reduction in force" within the meaning of the termination plan. The employer, in its capacity as a plan administrator, denied this request by holding that the sale of the division did not constitute a "reduction in force" within the meaning of that term as it is used in the termination pay plan. The district court granted summary judgment for the Defendants on this count by holding that the employer did not act arbitrarily or capriciously in construing the term "reduction in force" to exclude a sale in which the purchaser offers continued employment. The employees appealed that decision.

On appeal, the Third Circuit acknowledged that the arbitrary and capricious standard of review has been applied by most courts in considering challenges to benefit plan administrator's denial of benefits. The Court, however, also found that this standard has not been applied unanimously or without misgivings, and noted that certain cases from the Third, Fifth and Ninth Circuits "... reflect[ed] significant dissatisfaction with the arbitrary and capricious standard when the employer can profit from its decision to deny benefits". *Id.* at 140.

In noting its dissatisfaction with the previous standard, the Court went on to reject the deferential arbitrary and capricious standard in context where the trustee is clearly not disinterested in the amount of severance pay awarded. In citing the new standard to be applied in these situations, the Third Circuit held:

> The trust in issue here provides severance benefits, which are a form of wages. The benefits were offered as an inducement to the Plaintiffs, to persuade them to work for Firestone [the employer].
>
> .  .  .  .  .
>
> In construing the agreement which embodies this aspect of the parties' bargain—the Termination Pay Plan—we therefore think it best to take as our starting point the principles governing construction of contracts between parties bargaining at arms' length. These principles counsel a construction of the trust document steering a middle course between the construction of the document now offered by Plaintiffs and Defendants. In light of the arms' length relationship between employer and employee, that seems most fitting here. Thus, the industry practice with respect to severance pay plans would shed light on this plan's meaning, as would past practice under the plan itself.

*Id.* at 145 (cited omitted).

The Court further noted that there was no evidence from which the intent of the

policy could be ascertained, the district court should supply an interpretation which is reasonable in the circumstances. *Id.* at 148.

■ Turning to the facts of this case, there seems to be no dispute that the Defendants, as plan administrators, profitted by its decision to deny the instant Plaintiffs severance pay. In fact, Plaintiffs point out that Cynthia P. Sonstelie, Vice President– Human Resources of Simpson Investment Company, testified in her deposition that the source of funds to pay severance benefits for both salaried and hourly employees was "... general corporate revenues, just like payroll. It's not prefunded." In that regard, we are required to apply the "arms length" standard promulgated in *Bruch* in order to ascertain the intent of severance policy.

*Analysis*

■ Plaintiffs have brought this complaint arguing that severance pay is warranted in the instant case because the policy provides severance pay for employees who are "curtailed" as the result of a period of reduction in salary positions due to business conditions, plant closure, or departmental reorganization; and here, Plaintiffs did in fact lose their employment with Simpson. The Plaintiffs suggest that this loss of employment with Simpson is a "curtailment" within the meaning of the severance policy. The Plaintiffs conclusion, however, seems to state the issue at the heart of this case: whether "curtailment" occurs when the employee loses his position with Simpson, or occurs when the employee loses his position at the plant altogether.

Having reviewed the file at length and the extensive briefing by the parties, we find that the latter is the construction which is most consistent with the policy's purpose and Simpson's prior parctice in applying the policy. We also find that it is the most reasonable construction of the policy.

The Simpson severance policy contains an express statement that the purpose of severance compensation is "to provide a period of salary continuance following termination." *See* Doc. 36 at Exh. D. Despite the Plaintiffs' arguments to the contrary, the language contemplates that severance pay is to provide a discharged employee with a salary during a period of unemployment which arises through no fault of his own. It follows that if the employee does not encounter any period of unemployment with its corresponding absence of an incoming salary, the remedial purpose behind the severance policy at issue—to provide salary continuance following termination—is not furthered by granting severance pay.

The prior practice of the parties also supports our holding here. The evidence seems to establish that in the sale of both the Eastern and Western branches of Simpson Building, Simpson did not make severance pay payments to any individual retained by the purchaser. One arguably contrary instance occurred in Indiana and Kansas, where Simpson employees were initially denied severance pay yet lost their jobs with the purchaser shortly after the sale. There, Simpson rehired the employees and curtailed them with full severance pay. Yet, we find that Simpson's actions in providing severance pay in those cases underscores its assertion that the severance pay policy is tied to the unemployment of its workers.[7]

---

7. The *Bruch* decision also directs the court to examine the industry practice in helping to determine the intent of the policy. However, the only evidence before the Court on the issue of industry practice involves an internal office memorandum drafted by the Simpson manager of employer relations. The recommendation which outlined Simpson's policy to deny severance to those employees retained by the purchaser spoke of industry practice as follows:
The above recommendation is somewhere in the middle of other timber companies due with regard to the sale of facilities. Some companies grant severance to all employees regardless of employment with the purchase (sic) while others don't grant severance if employment continues.
*See* Doc. 36, Exh. 5 at p. 2. As a practical matter, the above does little to further the cause of either party as the memorandum suggests that the industry recognizes the position of both parties.

We further find that any difference in the employees' compensation before and after the sale is not of such magnitude as to compel the grant of severance pay in the instant case. As the Defendants point out, there is no dispute that on September 17, 1984, each of the 26 Plaintiffs was continued in employment by Hudson at the identical salary with the identical package of medical and life insurance benefits which they had when employed with Simpson. Later, however, it appears that Hudson increased the deductible and payments associated with Plaintiffs' medical coverage, and that two of the Plaintiffs had their compensation shifted from a straight salary to a reduced salary plus incentive formula. Nevertheless, we agree with the Plaintiffs that such changes, which occurred well after Simpson sold the plant to Hudson, are not necessarily relevant to the question of whether to grant severance pay at the time of the plant's sale absent any evidence of collusion between the parties. Moreover, the changes that occurred are not the kinds of alterations in employment which would constitute "curtailment" within the meaning of the severance pay policy.

In the final analysis, we would liken the Simpson Severance Pay Policy to an insurance policy against unemployment. In essence, Simpson's employees were insured against a loss of income while employed with Simpson.[8] At the time of the sale of the facility to Hudson, the employees remained employed (although not by Simpson) and it appears that the vast majority of those employees have continued employment with Hudson up until the date of this Order. Therefore, the protection afforded by the severance policy did not arise at the time of the sale as the Plaintiffs had no claim of unemployment.

In light of the above, we find that the Defendant properly construed the severance policy in the instant case and breached no duty to the Plaintiffs in denying the benefits; we also find that the Defendants'

construction was the most reasonable construction to further the intent of the policy.[9] Therefore, the Defendants' motion for summary judgment will be granted and the Clerk of Court will be directed to close this case.

---

8. It is important to note that case law cited by the Defendants establishes that there was no vesting of these rights which would continue beyond employment with Simpson.

9. We also find as a matter of law that the Defendants' failure to follow the reporting requirements of ERISA does not entitle the Plaintiffs to any relief under the circumstances of this case.