Edwin KOTROSITS, Julius Ruggeri, and Marvyn Souders, on their own behalf and on behalf of all others similarly situated

v.

GATX CORPORATION NON-CONTRIBUTORY PENSION PLAN FOR SALARIED EMPLOYEES.

Civ. A. No. 88-1835.

United States District Court, E.D. Pennsylvania.

Feb. 25, 1991.

**1436**

Kevin T. Fogerty, Jeffrey B. Albert, Traub, Butz & Fogerty, P.C., Allentown, Pa. (Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., of counsel), for plaintiffs.

Herbert L. Zarov, Kenneth E. Wile, Mayer, Brown & Platt, Chicago, Ill., Robert L. Hickok, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

OPINION

CAHN, District Judge.

In this dispute over the extent to which the defendant owes the plaintiffs pension benefits, the parties have filed extensive pre-trial and post-trial briefs, stipulations of facts, and exhibits. After a non-jury trial, I make the following:

## I. FINDINGS OF FACT [1]

A. The Parties

1. The representative plaintiffs are:

a. Edwin Kotrosits, a resident of Coplay, Pennsylvania for more than 30 years. S.1.

b. Julius Ruggeri, a resident of Bethlehem, Pennsylvania for more than 30 years. S.19.

c. Marvyn Souders, a resident of Orefield, Pennsylvania for more than 30 years. S.29.

2. The defendant is the GATX Corporation Non–Contributory Pension Plan for Salaried Employees ("the Plan"), a defined benefit, non-contributory pension plan, qualified under ERISA, covering salaried employees of GATX Corporation and other participating employers. Exh. 3. No amendments were made in 1986 to any provisions of the Plan at issue in this lawsuit. S.35.

3. The Plan is administered from and is amenable to service at 120 South Riverside Plaza, Chicago, Illinois, 60606. S.36.

4. From January 1, 1986 to the present, James A. Herbert has been Plan Administrator. S.37.

5. From May, 1980 to January, 1986, Samuel E. Kohler was Plan Administrator. S.38.

B. The Relationship of GATX and Fuller

6. On or about August 17, 1954 GATX Corporation ("GATX"), then called General American Transportation Corporation, pur-

---

1. No evidence was introduced at trial, as the parties stipulated to the facts of this case. Thus, the findings of fact in this section are drawn from the parties' Stipulation ("S."), Supplemental Stipulation ("S.S."), and Stipulated Exhibits ("Exh."). This court has omitted some of the stipulations on the basis of relevancy and has drawn inferences of fact from the evidence before it.

chased all of the outstanding shares of Fuller Company, a Delaware corporation. S.35.

7. In 1975 General American Transportation Corporation ("GATC") was formed as a GATX subsidiary. From 1975 to December 31, 1986, Fuller Company ("Fuller") was a subsidiary of GATC and a second-tier subsidiary of GATX. S.41. Between 1954 and December 31, 1986, Fuller was a wholly-owned direct or indirect subsidiary of GATX. S.40.

8. On December 31, 1986 pursuant to a Stock Purchase Agreement, GATX Corporation caused GATC to sell all of its shares of Fuller Company stock to F A Holding Corporation ("F A Holding"). I shall refer to this transaction as the "Fuller sale." S.68 and Exh.13.

9. As of the morning of December 31, 1986, Fuller owned and operated facilities in Allentown, Bethlehem, Catasauqua, and Mannheim, Pennsylvania, as well as certain subsidiaries and foreign operations. S.44.

10. As of December 31, 1986, there were approximately 664 Fuller salaried employees who were participants in the Plan. Of these, sixty-six were at Fuller's Compton facility, which was not included in the Fuller sale. S.45.

11. From 1954 to the present, Fuller Company has had its world headquarters in Bethlehem, Pennsylvania. S.43.

12. GATX and GATC have had their corporate headquarters in Chicago, Illinois at all times relevant to this litigation. S.42.

C. The GATX Pension Plan and Fuller

13. GATX first adopted its separate pension plan for salaried employees of GATX and participating subsidiaries on January 1, 1965. S.64.

14. Effective January 1, 1965, upon receiving authorization to do so, Fuller Company adopted the Plan and became an "Affiliated Company." S.65.

15. The GATX Board of Directors appoints the members of the Benefits Committee for the Plan. S.66.

16. Before the Fuller sale, Fuller (not GATX) made contributions to the Plan on behalf of Fuller employees. S.S.15.

17. GATC, a GATX subsidiary and Fuller's parent, provides limited health care and life insurance benefits for retired employees who meet established criteria. Most domestic employees are eligible for the insurance benefits as they retire under the GATX plan. GATX pays the premium for this coverage provided by an insurance company. The premiums are allocated to GATC based on benefits paid during a particular year. S.6.

18. The GATX Plan offers the following retirement options: (1) normal retirement (age 65); (2) 62/15 (unreduced benefit at age sixty-two provided that the employee has fifteen years of service); (3) 90 points (unreduced benefit available provided that the employee's age and years of service add up to ninety); (4) 75/80 points (unreduced benefit available in the event of plant shutdown, layoff, extenuating circumstances or disability available (i) when the employee is at least fifty-five and the employee's age and years of service add up to seventy-five or (ii) when the employee's age and years of service add up to eighty); and (5) 55/15 (retirement with an actuarially reduced benefit for employees who are at least fifty-five with fifteen years of service). Exh. 3, Article 4.

D. The Fuller Sale

1. *The Structure of the Sale*

19. In May, 1985 Elmer Gates, then President and Chief Operating Officer of Fuller Company, learned from Ken Krick that Fuller was for sale. Ken Krick was, at that time, Chairman of Fuller and a Senior Vice President at GATX. S.S.1.

20. Elmer Gates and five other members of Fuller's senior management (John Leidner, John Alogna, Erwin Decker, Gopal Kapoor, and Gerald Labelle) formed F A Holding to purchase the shares of Fuller from GATC through a management leveraged buyout. S.69.

21. During 1986 several entities, including Ecolaire, Peter Robbins, and Polysius (a German company), discussed with GATX the possibility of acquiring Fuller.

22. Shortly before October 12, 1986, GATX decided to sell Fuller to F A Holding. The parties agreed to structure the transaction as a sale of stock rather than a sale of assets. S.71.

23. The members of Fuller senior management effectuating the buyout retained their job titles following consummation of the sale on December 31, 1986, although Elmer Gates also became Chairman of the Board of Fuller Company at that time. S.70.

24. The draft stock purchase agreement prepared by GATX and/or its legal counsel contained the following clause:

*GATX Salaried Pension Plan.* Certain salaried employees of Fuller participate in the GATX Salaried Pension Plan. Effective as of the first day of the calendar month in which the Closing Date occurs (the "Spinoff Date"), GATX shall spinoff the portion of the GATX Salaried Pension Plan attributable to current and former Fuller employees, which spunoff portion shall be known as the Fuller Salaried Pension Plan. The amount of assets transferred to the Fuller Salaried Pension Plan shall be equal to the sum of (i) the present value of all accrued benefits of current and former Fuller employees determined as of the Spinoff Date on the basis of the actuarial assumptions used by the actuary for the GATX Salaried Pension Plan to determine the present value of accrued benefits under that plan as of January 1, 1986, plus (ii) interest at the rate of 8½% per annum on such present value from the Spinoff Date to the date of transfer. On and after the Spinoff Date the Fuller Salaried Pension Plan shall be responsible for all pension and ancillary benefits attributable to current and former Fuller employees. Prior to the Closing Date, Fuller shall have contributed its allocable portion of the minimum funding amount required under section 412 of the Code for the GATX Salaried Pension Plan with respect to that portion of the 1986 plan year which precedes the Spinoff Date and shall have taken all steps necessary to adopt the Fuller Salaried Pension Plan. S.93 & Exh.15.

25. The final agreement did not contain the above-quoted language. Section 5.10(b) of the final agreement provided:

*GATX Salaried Pension Plan.* Certain salaried employees of Fuller participate in the GATX Salaried Pension Plan and shall be referred to as "Fuller Participants" for purposes of this subsection 5.10(b). It is understood that the Closing Date hereunder is a Termination of Employment under the terms of the GATX Salaried Pension Plan for all Fuller Participants, and that Fuller will cease to be an Employer under the GATX Salaried Pension Plan as of the Closing Date. Effective as of the Closing Date GATX shall cause the GATX Salaried Pension Plan to be amended to provide that Fuller Participants employed by Fuller on the Closing Date will be fully vested in their normal retirement benefit accrued as of the Closing Date under the GATX Salaried Pension Plan. GATX shall indemnify and defend, at its own expense, Fuller and Purchaser and any pension plan for salaried employees maintained by Fuller or Purchaser against any and all claims, liabilities, losses, damages, costs and expenses relating to or arising directly or indirectly out of a claim that GATX Salaried Pension Plan is required, under its terms as in effect on or before the Closing Date, to provide subsidized early retirement benefits to Fuller Participants, or out of a claim that Fuller or Purchaser or any salaried pension plan maintained by Fuller or Purchaser is required by law to provide subsidized early retirement benefits to Fuller Participants because of the provisions of the GATX Salaried pension Plan as in effect on or before the Closing Date. S.94 & Exhs.13 & 15.

26. The phrase "subsidized early retirement benefits" in Section 5.10(b) of the Stock Purchase Agreement between GATX, GATC and FA Holding referred to the 62/15, the 75/80, and the 90 point pensions. S.109; *see* Finding of Fact 18.

27. Section 5.10(i) of the Stock Purchase Agreement states, in relevant part:

*Retiree Benefits.* Effective as of the Closing Date, the Purchaser shall cause Fuller to reimburse GATX without any right of setoff for $600,000 of the annual costs incurred by GATX in continuing to provide health and welfare benefits being provided as of the Closing Date to former employees of Fuller who have retired prior to the Closing Date, such reimbursement to be made within 30 days after receipt of monthly invoices from GATX setting forth in reasonable detail the calculation of such costs.... Exh. 13.

28. "Discontinued operation" is an accounting term, defined in Paragraph 401 of Section I13 of the FASB Accounting Standards, (General Standards as of 1986), that is used to describe sales and other dispositions of businesses. S.S.34 & Exh.45.

29. Ralph O'Hara, Treasurer of GATX Corporation, relied on Paragraph 401 in characterizing the Fuller Company leveraged buyout as a "discontinued operation" in the 1986 GATX Corporation Annual Report and in GATX Corporation's filings with the Securities and Exchange Commission. S.S.35 & Exh.46.

### 2. *The Sale's Effect on Employment at Fuller Company*

30. As of October, 1986, F A Holding had made no decisions regarding the continued employment of employees at Fuller corporate headquarters. S.S.7.

31. In a private placement memorandum dated October 1986, F A Holding stated that it planned to reduce the number of employees at Fuller corporate headquarters by as many as twenty-seven persons. The same memorandum discussed the possible closing of the Fuller Catasauqua facility. Exh.24.

32. In late December, 1986 the principals of F A Holding discussed reducing the number of employees at Fuller. S.S.9 & Exh.37.

33. Mr. Gates never directly told anyone at GATX or the Plan that there was a possibility of a reduction in force at Fuller being discussed by the members of F A Holding. S.S.10 & Exh. 35.

34. Prior to the December 31, 1986 sale date, F A Holding did not provide Mr. Herbert, the Plan Administrator, with any information identifying what persons, if any, Fuller intended to terminate following the sale. S.77.

35. No list of job positions that might be eliminated at Fuller after the sale was ever shown to anyone at GATX. S.S.11.

36. Mr. Herbert understood that F A Holding was buying Fuller as a "continuing business." S.75 & Exh.36.

37. Mr. Gates of F A Holding advised GATX that Fuller was being sold as a continuing business. S.S.14 & Exh.36.

38. On November 19, 1986 there was a meeting at Fuller World Headquarters to discuss the effects of the Fuller sale. The GATX plan administrator paraphrased Elmer Gates as stating at that meeting that, "We're going to hit the ground running. We look to continue the Fuller operation." S.S.38 & Exh.48.

39. On the first business day after January 1, 1987, all Fuller Company facilities in existence prior to the sale were open for business and continued manufacturing and selling the same products that Fuller Company manufactured and sold prior to December 31, 1986. S.79.

40. After the sale of December 31, 1986, no Fuller Company facilities ceased operations until April 30, 1987. S.S.8.

41. In late 1986 Mr. Earl Herman, then Personnel Manager at Fuller Company, became aware that some Fuller employees might not be needed after the sale to F A Holding. Exh.42.

42. After January 1, 1987, Earl Herman prepared a handwritten list of Fuller employees who were terminated on either January 2 or January 5, 1987. Mr. Herman compiled this list to advise Fuller Company's Payroll Department of what wages had to be paid and what severance or vacation payments had to be made. Mr. Herman never provided this list to anyone at GATX Corporation or the Plan. S.S.27 & Exh.41.

43. Lois Smith, one of the people included in Mr. Herman's list of terminated Fuller employees, worked under the supervision of Earl Herman prior to her January 5, 1987 termination. Mr. Herman decided to terminate Ms. Smith, because she had "very limited capabilities" and there was no place where she could be used productively. Although he made that determination in December, 1986, Mr. Herman was instructed not to tell Ms. Smith of her termination until after January 1, 1987.

44. Mr. Herman testified at deposition that other people who held supervisory positions were also told to wait until after January 1, 1987 to make any communications to inform people of their impending employment termination.

45. Before December 31, 1986, Elmer Gates knew that Fuller employees had expressed concern about having jobs after the December 31, 1986 buyout. S.S.17.

46. At a pre-December 31, 1986 communication session with Fuller employees, Elmer Gates advised the retiring employees that their supervisors would notify them after January 1, 1987 concerning whether or not they had a job at Fuller Company. S.S.30.

47. After January, 1987, there was a reduction in the number of salaried employees working at various locations for Fuller. Twenty-two employees were terminated, nineteen of whom were salaried. Elmer Gates made the decision to carry out that reduction and those terminations during the working days immediately after January 1, 1987. S.S.18 & Exh.37.

48. Fuller informed the terminated employees of Gates' decision on the first working day after January 1, 1987. S.S.19.

49. None of the Fuller employees terminated in the first week of January, 1987 is a member of either the Ruggeri or Souders subclasses in this litigation. S.S.32.

50. After January 1, 1987, Fuller management eliminated at least two senior management and/or other supervisory positions at Fuller. S.S.20.

51. Between July 31, 1986 and December 31, 1986, no layoffs occurred at any Fuller facility, aside from the alleged layoffs suffered by the plaintiffs. S.76.

### 3. *The Sale's Effect on Fuller Benefits*

52. On or before November 7, 1986 Mr. Herbert determined that Fuller employees would not be eligible for 75/80 point benefits under Section 4.5 of the Plan because neither layoffs nor plant shutdowns would occur upon the sale of Fuller stock. In making that determination, Mr. Herbert took into consideration the structure of the transaction and the fact that the principals of F A Holding planned to maintain Fuller as an ongoing company. S.72.

53. On November 7, 1986 Mr. Herbert, Mr. Ronald Ciancio, GATX's Assistant General Counsel, and Mr. Krick met to resolve certain pension-related issues. At that meeting, they reached the following decisions: 1) no 75/80 pensions would be granted as a result of the Fuller sale; 2) only employees who retired on or before December 31, 1986 would be entitled to medical and life insurance benefits; and 3) no service credit would be granted after December 31, 1986. To the best of Mr. Herbert's recollection, although Mr. Krick disagreed with the decision to deny 75/80 point benefits, Mr. Ciancio agreed. Exhs.78 & 86.

54. On or before November 7, 1986 Earl Herman also concluded that employees at Fuller facilities would not be eligible for 75/80 point benefits due to the sale. Mr. Herman is a member of the Souders subclass, and he has not opted out. Messrs. Kotrosits, Souders, and Ruggeri disagree with Mr. Herman and believe that they are eligible for 75/80 point benefits under the terms of the Plan. S.73 & Exh.40.

55. Prior to the Fuller sale, GATX adopted the policy that retirees' medical and life insurance benefits provided by GATC for retirees would be available only to those Fuller employees who submitted retirement applications prior to December 31, 1986. Participants who submitted retirement applications after that date were permitted to retire retroactively in accordance with the terms of the Plan, but those persons would not receive the lifetime medical and life insurance benefits. S.7.

56. GATX did not cancel the retiree medical and life insurance benefits for all employees covered by the Plan. The decision to discontinue the retiree benefits apparently only affected Fuller employees. Exh.86.

57. At a November 19, 1986 meeting, James Herbert advised Fuller employees, including Messrs. Kotrosits, Ruggeri and Souders, that if they did not submit a pension application form prior to December 31, 1986, they would not receive lifetime medical and life insurance benefits. S.10.

58. At the November 19 meeting, Mr. Herbert also informed the employees, for the first time, that they would not be eligible for 75/80 point benefits under the Plan. S.74.

59. As of January, 1987, Fuller did not continue to offer comparable lifetime medical or life insurance benefits to its employees. S.9.

60. Plan participants employed at Fuller who retired on or prior to December 31, 1986 locked in the lifetime medical and life insurance benefits. S.8.

61. The Plan has never received a 75/80 point pension application from any Fuller employee and Plan participant who ceased working at a Fuller facility on or after January 2, 1987. S.78.

E. The Decision of the Plan

62. On or about July 8, 1986 GATX personnel began considering the impact on the Plan of a potential sale of Fuller. S.82.

63. The following persons, among others, were involved in that process:

*From GATX:*

a. Ronald Ciancio, Esquire, Assistant General Counsel, GATX

b. James A. Herbert

c. Kenneth Krick

d. John Levin, Esquire

*From Mayer, Brown & Platt, Outside Counsel for GATX in the sale of Fuller:*

a. Herbert Krueger, Esquire

*From Hewitt & Associates, consulting actuaries for GATX and GATX Pension Plan:*

a. Lynn Cornwall, Actuary S.83.

64. Mr. Krick was the primary GATX negotiator with F A Holding. S.84.

65. For at least the past five years, Hewitt and Associates has served as the pension actuaries for the GATX Non–Contributory Pension Plan for Salaried Employees. S.96.

66. During the past five years, Lynn Cornwall has been the Hewitt and Associates employee who has had primary responsibility for performing the pension actuary work and consulting services. S.97.

67. Prior to October 12, 1986, Mr. Herbert obtained from Hewitt and Associates an outline of various scenarios potentially resulting from the sale of Fuller to some other entity. Additionally, Mr. Herbert obtained cost estimates from Hewitt & Associates for alternatives under consideration. S.85.

68. Prior to October 12, 1986, Hewitt and Associates told Mr. Herbert that the award of 75/80 point benefits to Fuller personnel would cost the GATX Pension Plan at least $2 million in excess of the cost which would otherwise be incurred as a result of the closing of the F A Holding/GATX transaction. S.88.

69. Mr. Krick asked Mr. Herbert for all information on the Plan under all circumstances, because the potential buyers of Fuller were interested in that information in complete detail. S.99.

70. After Mr. Herbert spoke with Ms. Cornwall on October 10, 1986 and received certain actuarial calculations which she had performed, he communicated that information to Mr. Krick. S.103.

71. Prior to October 12, 1986, Mr. Herbert knew that F A Holding would not assume the assets and liabilities of the GATX Pension Plan applicable to Fuller employees. S.86.

72. Prior to October 12, 1986, Mr. Herbert knew that GATX intended to termi-

nate the participation of Fuller employees in the GATX Pension Plan effective upon the closing of the F A Holding/GATX transaction. S.87.

73. Mr. Herbert did not contact Mr. Gates to discuss the future of Fuller until mid-November, 1986. Mr. Herbert received information regarding the transaction and the future of Fuller from Mr. Krick and other GATX employees who were in contact with Mr. Gates and other members of F A Holding. S.89.

74. Mr. Herbert visited Fuller's headquarters on November 18–19, 1986, and he met with Fuller personnel, some of whom had expressed concern over their future with Fuller and their pension rights with GATX. S.90.

75. Mr. Herbert's decision that Fuller employees were ineligible for the 75/80 Points Retirement was based on, among other things, his understanding that F A Holding intended to continue Fuller as an ongoing business. S.91.

76. Mr. Herbert believed that prior actions by GATX and the Plan supported his decision. S.92.

77. Mr. Herbert testified at deposition that the subject of 75/80 point benefits came up during his discussions with Herbert Krueger, GATX Corporation's ERISA counsel for the Fuller sale. Mr. Herbert, although unable to recall the substance of Mr. Krueger's advice, believes that he would have reviewed his conclusion had Mr. Krueger advised him that the Plan would have to award 75/80 point benefits. S.S.39 & Exh.49.

78. On October 8, 1985, in response to concerns expressed by Fuller employees regarding their retirement plans, Mr. Gates, then President of Fuller, sent a memorandum to all Fuller employees. S.94. Mr. Gates attached a memorandum from GATX explaining the possible effects of a Fuller sale on benefits under the GATX pension and savings plan. Exh.16.

79. On or before December 31, 1986 Mr. Herbert prepared a draft memorandum stating that, because the closing date for the sale of Fuller had been delayed, the employees who had submitted applications would continue to accrue service "as a GATX employee" until the sale was carried out. Mr. Herbert never sent the memorandum. Exh.52.

80. On January 13, 1987 Mr. Krueger sent Mr. Herbert a memorandum which addressed two issues: 1) whether Fuller employees would be eligible to receive Plan benefits while they remained in Fuller's employ and 2) whether Fuller employees would continue to accrue service toward retirement eligibility after the sale. S.120 & Exh.25.

**F. The Decisions of the Representative Plaintiffs**

*1. Edwin Kotrosits*

81. Between 1955 and December 31, 1986, Mr. Kotrosits worked at facilities operated by Fuller, reaching the position of Quality Control Manager at the Fuller Catasauqua plant. S.2.

82. In 1970 Mr. Kotrosits became a participant in the Plan. S.3.

83. On or about December 18, 1986 Mr. Kotrosits submitted a pension application form under the actuarially reduced 55/15 option of the Plan. S.4 & Exh.1.

84. Although no one affiliated with Fuller or GATX instructed or ordered Mr. Kotrosits to submit a pension application, he was coerced into submitting his application. Mr. Kotrosits testified at deposition that the prospect of not receiving the medical and life insurance benefits "scared the hell out of" him. S.5, 11.

85. Mr. Kotrosits said that he probably would not have retired on or prior to December 31, 1986 if he had been told that Fuller intended to offer the same medical and life insurance benefits that GATC had provided. S.12.

86. On December 31, 1986 Mr. Kotrosits retired from his employment at 58.3333 years old, with 31.25 years of accumulated service credit under the Plan. S.13. If the Fuller sale resulted in a plant shutdown or layoff, Mr. Kotrosits was eligible for 75/80 benefits pursuant to § 4.5 of the Plan.

87. When Mr. Kotrosits left work on December 31, 1986, no one had informed

him whether he would have a job with Fuller after the sale. S.18.

88. Shortly before the Fuller sale date, Mr. Kotrosits' plant manager asked him whether he would be willing to continue to work. The plant manager said, "we'll give you a phone call January the 2nd. Stay close to your phone." S.17.

89. On January 2, 1987, the next business day on which the Catasauqua plant was open, Mr. Kotrosits received an early morning phone call, prior to 7:00 a.m., inviting him to return to work. S.14.

90. On January 2, 1987, Mr. Kotrosits went back to his employment as a Quality Control Manager at the Fuller Catasauqua plant and has continued in that position from January 2, 1987 to the present. S.15.

91. When Mr. Kotrosits went to work on January 2, 1987, he went back to the same job from which he had retired on December 31, 1986 and continued to work for the same supervisor. S.16.

2. *Julius Ruggeri*

92. Between 1954 and December 31, 1986, Mr. Ruggeri worked at facilities operated by Fuller, reaching the position of Group Leader for Parts Programming in the Numeric Control Department at the Fuller Catasauqua plant. S.20.

93. On or about December 22, 1986 Mr. Ruggeri submitted a pension application form, applying for retirement under the actuarially reduced 55/15 option in the Plan. S.21 & Exh.2.

94. No one affiliated with Fuller, GATX, or any other entity instructed or ordered Mr. Ruggeri to submit a pension application. S.22.

95. On December 31, 1986, Mr. Ruggeri retired from his employment. As of that date, Mr. Ruggeri, 56.75 years old, had accumulated 32.3333 years of service credit under the Plan. S.23. If the Fuller sale resulted in a plant shutdown or layoff, Mr. Ruggeri would be eligible for 75/80 benefits pursuant to § 4.5 of the Plan.

96. Prior to December 31, 1986, Mr. Ruggeri's plant manager asked him if he would like to work for Fuller after the sale. The plant manager told Mr. Ruggeri that

he was too young to retire. The manager stated, "as of now we can't tell you anything. You'll get a telephone call on the second letting you know whether to come to work or not." S.27.

97. Mr. Ruggeri left work on December 31, 1986 without knowing whether he would have a job with Fuller after January 1, 1987. S.28.

98. On January 2, 1987, the next business day on which the Catasauqua plant was open, Mr. Ruggeri received a phone call before 7:00 a.m. inviting him to return to work. S.24.

99. On January 2, 1987 Mr. Ruggeri went back to the same job from which he had retired, Group Leader for Parts Programming at the Fuller Catasauqua plant, and has continued in that position from January 2, 1987 to the present. When Mr. Ruggeri returned to Fuller, he worked for the same supervisor as he had before the Fuller sale. S.25, 26.

3. *Marvyn Souders*

100. From 1955 to the present, Mr. Souders has worked at facilities operated by Fuller, reaching the position of Product Engineer at the Fuller Bethlehem facility. S.30.

101. On December 31, 1986 Mr. Souders, 49.75 years old, had accumulated 31.5833 years of service credit under the Plan. S.31. If the Fuller sale constituted a plant shutdown or layoff under the plan, Mr. Souders would be eligible for 75/80 point benefits.

102. Mr. Souders was not eligible for actuarilly reduced retirement under the 55/15 option on or before December 31, 1986, because he was not yet 55 years old. S.33.

103. As of January 5, 1987, the first business day in 1987 at the Fuller Bethlehem facility, Mr. Souders worked at the same job, under the same supervisor, as he had as of December 31, 1986. S.32.

104. Mr. Souders, like Messrs. Kotrosits and Ruggeri, did not know whether Fuller would employ him after the sale of stock. Unlike Kotrosits and Ruggeri, he was told

to report to work on January 5, 1987, at which time the company would tell him whether he had a job or not. S.34.

105. Mr. Souders reported to work at the Fuller Bethlehem headquarters on Monday, January 5, 1987, and continued performing the same duties he had performed prior to December 31, 1986, under the same supervisor. S.80.

106. Mr. Souders submitted a request for retirement information dated as of October 17, 1986. S.50 & Exh.6.

107. Prior to December 31, 1986, Souders received a memorandum (misdated as 12/18/87, probably circulated on or about 12/18/86) addressed to "All Fuller Company Salaried Employees." S.51 & Exh.7.

### G. Who Employed the Plaintiffs?

108. Prior to the sale, the plaintiffs never received any notification that they were GATX and not Fuller employees. S.46.

109. All W2 forms produced by plaintiffs for the years 1986 and earlier stated that their employer was "Fuller Company." S.47 & Exh.4.

110. Prior to December 31, 1986, Fuller employees received their payroll checks from a bank account held in the name of GATX. "GATX" and not "Fuller" appeared on the checks and paystubs. S.61.

111. Prior to December 31, 1986, service awards given to Fuller employees referenced GATX. S.62.

112. During the course of their employment at Fuller, Kotrosits, Souders, and Ruggeri received numerous memoranda and internal correspondence on stationery which referenced GATX but made no reference to Fuller. S.63.

113. Before December 31, 1986, Messrs. Kotrosits, Ruggeri, and Souders each received a Summary Plan Description. They received a variety of literature regarding the Plan and other employee benefits that referenced GATX, some of which did not expressly refer to Fuller. S.58 & Exh.11.

114. Messrs. Kotrosits, Ruggeri, and Souders each had read through the Plan prior to the Fuller sale. S.67.

115. The December, 1986 memorandum received by Kotrosits and Souders was from Elmer Gates and addressed the issue of employee benefits after the sale of Fuller. Among other things, the memorandum described the Employee Benefits available to Fuller employees after the sale. With regard to their pensions, Fuller employees were informed that they would be 100% vested in their accrued GATX pension as of December 31, 1986. Fuller employees would receive that benefit at their Normal or Early (if applicable) Retirement Dates. They would begin accruing service credit for the new Fuller plan on January 1, 1987 and would not receive credit for prior GATX service. Exh. 7.

116. Fuller employees will not vest in the new Fuller plan until they have completed 5 years of service for the new Fuller company. Exh.7.

117. Prior to the sale of Fuller, Mr. Kotrosits had heard Fuller referred to many times as a subsidiary of GATX. Mr. Kotrosits testified at deposition that when he had heard Fuller referred to as a "subsidiary" of GATX, that meant to him that "our division, the entity Fuller Company" was owned by GATX. S.57.

118. On or about May 1, 1984 Mr. Kotrosits received his "GATX Performance Appraisal Form." S.59 & Exh.12.

119. Prior to December 31, 1986, Mr. Kotrosits received a memorandum (misdated as 12/18/87, probably circulated on or about 12/18/86) addressed to "All Fuller Company Salaried Employees." S.60 & Exh.7.

120. Mr. Kotrosits testified at deposition that, as of December 31, 1986, he regarded his employer as "Fuller Company, owned by GATX. I felt I was an employee of GATX." S.56.

121. On or about June 1, 1986 Mr. Ruggeri received his "GATX Performance Appraisal Form." S.52 & Exh.8.

122. On or about November 17, 1986 Mr. Ruggeri sent a letter to Ken Krick, a GATX executive. S.53 & Exh.9.

123. On or about November 24, 1986 Mr. Ruggeri's wife, Mary Ann Ruggeri, sent a letter to Mr. Krick. S.59 & Exh.10.

124. Mr. Ruggeri testified at deposition that in 1986, prior to the sale of Fuller, he would have responded in informal conversation that his employer was "Fuller Company." S.55.

## H. The Claims

125. In March, 1987 Ruggeri, Kotrosits, and Souders (by separate letter) submitted letters asserting their eligibility for 75/80 point benefits to James Herbert, the Plan administrator. S.105 & Exh.20.

126. On March 30, 1987 Mr. Herbert wrote each of the plaintiffs to inform them that their claims for 75/80 point benefits were denied. S.106 & Exh.21.

127. Mr. Herbert based his decision on his understanding that Fuller continued as a going concern after the sale. Specifically, Mr. Herbert relied on the fact that, according to Elmer Gates, president of Fuller before the sale and president and chairman of the board after the sale, Fuller would continue to operate the same facilities with essentially the same employees. Moreover, Mr. Herbert understood that Ruggeri, Kotrosits, and Souders all continued to work for Fuller. S.107.

128. Mr. Herbert also based his decision on his understanding of the Plan's treatment of prior sales of GATX subsidiaries as going concerns. Those subsidiaries were GARD, Marine Transport Lines, Inc. (MTL), and the Richmond terminal. S.108.

129. Prior to making his initial decision in November, 1986, Mr. Herbert had consulted with Ronald J. Ciancio, Assistant General Counsel of GATX Corporation, who had concurred in Mr. Herbert's interpretation of the Plan as it applied to the Fuller sale. Mr. Herbert also consulted with the previous Plan Administrator, Mr. Kohler. S.109.

130. Mr. Krick did not totally agree with Mr. Herbert's determination regarding the availability of 75/80 point benefits under the Plan. Mr. Krick did not think that 75/80 had to apply, but he would have preferred that the Plan make those benefits available. S.110.

131. On April 30, 1987 Messrs. Ruggeri, Kotrosits, and Souders (by separate letter) appealed Mr. Herbert's determinations to the Plan Benefits Committee. S.111 & Exh.22.

## I. The Actions of the Plan Benefits Committee

132. On June 8, 1987 the Plan Benefits Committee met and affirmed the Plan Administrator's denial of plaintiffs' claims. Messrs. Ciancio, Herbert, and Krueger also attended the meeting. One day prior to the meeting, Mr. Herbert distributed a chronology and copies of certain documents to the committee members. S.112 & Exh.23.

133. The GATX Benefits Committee, which had the authority under the GATX Pension Plan to overrule Mr. Herbert's denial of benefits, consisted of the Chairman and CEO of GATX (James Glasser), the Vice–President and General Counsel of GATX (Paul Heinen), and the Vice President of Human Resources of GATX (Roland Finkelman). S.114 & Exh.23a.

134. At the meeting, the Committee heard and approved the reasoning underlying Mr. Herbert's decision. The Committee based their approval on the following factors: 1) GATX sold Fuller as a going concern; 2) Fuller had retained essentially the same employees as had been employed there before the sale; 3) Messrs. Ruggeri, Kotrosits, and Souders all continued to work at Fuller; and 4) the Fuller sale resembled the prior MTL, Richmond Terminal, and GARD transactions (where no 75/80 point benefits had been afforded) and did not resemble the Pollock and GATX Tank Erection Corporation ("TEC") transactions (including facility shutdowns) and the GATC Sharon, Pennsylvania plant shutdown where 75/80 point benefits had been applied for and granted. Those transactions are described *infra*. S.113.

135. To the best of Mr. Herbert's recollection, neither Mr. Ciancio nor Mr. Krueger participated in any discussions during the June 8, 1987 meeting. S.116.

136. Mr. Herbert advised the committee members that denial of 75/80 point retirement to Fuller employees was consistent with the decisions taken in MTL and other situations where the business continued following the sale of each company. S.117.

137. Roland I. Finkelman, GATX Corporation Vice President and a member of the Benefits Committee when it reviewed the plaintiffs' claims for 75/80 point benefits, testified at deposition that the plaintiffs' continuing employment at Fuller "was one of the integral parts" of the Committee's decision to deny the plaintiffs' 75/80 point claims. S.S.42.

138. When the Committee made its determination that the Fuller sale did not trigger 75/80 benefits on June 9, 1987, F A Holding had not yet adopted a pension plan for Fuller employees. *See* Exh.39.

139. Prior to plaintiffs' claims, no claims for 75/80 point benefits triggered by the sale of a business had previously been submitted for the Benefits Committee's review. S.S.43.

140. On March 14, 1986, GATX sent a memo to all holders of the GATX Personnel Policy and Practices Manual notifying them of an amendment to clarify that severance pay was thereafter not available for employees of subsidiary companies that are sold, spun-off or otherwise disposed of by GATX as going concerns, where those employees were offered the opportunity for continued comparable employment. S.S.44 & Exh.51.

J. Plan Treatment of Prior Sales and Cessations of Operations

1. *Marine Transport Lines, Inc.*

141. Prior to March 15, 1983, Marine Transport Lines, Inc. ("MTL") was a wholly-owned subsidiary of GATX Corporation and an affiliated company under the Plan. S.123.

142. On March 16, 1983 GATX spun off all of the shares of MTL to the shareholders of record of GATX. Management of MTL remained in the hands of the officers who had managed the company prior to the spinoff. S.124.

143. The distribution of MTL stock was made as a special dividend to GATX shareholders, who received the stock without paying any consideration to GATX. Exh.28.

144. As of December 31, 1982, all MTL salaried employees were terminated as participants in the Plan, and MTL ceased to be a participating employer under the Plan. As of that date, approximately 175 MTL salaried employees were participants in the Plan. S.125.

145. No employees ceased working at MTL facilities, which remained open and continued operations after the spinoff of stock. S.126.

146. As of March 16, 1983, the Plan expected MTL employees to continue their employment with MTL after the spinoff. S.131.

147. No MTL employees applied for or received 75/80 point benefits as a result of the March 16, 1983 stock spinoff. S.128.

148. In the last half of 1982, prior to the spinoff, senior MTL management proposed to five employees that they be laid off pursuant to Section 4.5(b) of the Plan. Section 4.5(b) provides for the award of 75/80 benefits to employees whose retirement is granted based on health or extenuating circumstances at the sole discretion of the employer. S.129.

149. Only one MTL employee, Cornelia B. Miller, accepted this proposal and elected to retire as of December, 1982. As a result, MTL laid off only one employee, Cornelia B. Miller, on December 31, 1982. S.130.

150. Ms. Miller submitted a pension application form and received 75/80 point retirement. S.132 & Exh.29.

151. On January 1, 1983 Mr. Kohler signed Cornelia B. Miller's pension application review form, providing for 75/80 benefits. S.134 & Exh.31.

152. Mr. Kohler believed that the 75/80 provisions would not apply to MTL because the spinoff of the shares of a wholly-owned subsidiary would not trigger the 75/80 provisions. Exh.81.

2. *Pollock Company*

153. Prior to January 1, 1984, Pollock Company was a subsidiary of GATX and an affiliated company under the Plan. As of that date, approximately 37 Pollock Company salaried employees were participants in the Plan. S.135.

154. On or about January 1, 1984 GATX Corporation ceased all operations at its Pollock Company subsidiary. GATX laid off all Pollock Company employees on or about January 1, 1984. The assets of Pollock Company were later sold for scrap. S.136.

155. All Pollock Company Plan participants with the requisite age and service credit who applied for 75/80 point pensions began receiving such pensions upon the approval of their pension applications. S.137.

156. Prior to the sale of Pollock Company's assets, its employees were given the following options: (1) being terminated immediately and receiving severance pay, but no further accrual of service credit, or (2) being placed on layoff status until they attained the requisite age and years of service to qualify for the 75/80 point retirement option. S.138.

157. Six Pollock employees received 75/80 point pensions, with their retirement dates as follows: Ladisloff Bondor—plant shutdown—3/1/84; Patsy W. Grieco— plant shutdown—3/25/86; Roland A. Mandoline—layoff—1/1/84; Roger G. Powell— plant shutdown—7/1/84; Chester R. Queen—layoff—1/1/84; Helga F. Smirnow—plant shutdown—3/25/86. S.139.

158. Bondor, Grieco, Powell, and Smirnow were permitted to continue to accrue age and service credit toward a 75/80 retirement after Pollock's operations were closed. S.140.

### 3. GARD Division

159. Prior to April 2, 1984, GARD Inc. ("GARD") was both a division and a subsidiary of GATX Corporation. S.141.

160. On April 2, 1984 GATX sold, pursuant to an asset purchase agreement, substantially all of the properties and assets of GARD to Chamberlain Manufacturing Corporation. S.142 & Exh.32.

161. Until April, 1984 approximately sixty-nine GARD salaried employees were participants in the Plan. S.143.

162. The sale of GARD's assets to Chamberlain did not affect GARD employees working at former GARD facilities after the sale. S.144.

163. GARD facilities remained open for business and continued operations after the sale. S.145.

164. No GARD employees applied for or received 75/80 point benefits as a result of the sale. S.146.

165. In deciding that 75/80 point retirement was not applicable to the sale of GARD, the Plan Administrator relied upon and considered the language of Section 4.5 of the Plan. S.147.

166. Prior to the sale of GARD's assets to Chamberlain Manufacturing, GATX and the Plan Administrator anticipated that GARD employees would continue working at those same GARD facilities after the sale took place. S.148.

167. The following provision of the asset purchase agreement for the GARD transaction provided that Chamberlain would assume the assets and liabilities of the GATX pension plan that related to GARD employees. Under the terms of the agreement, Chamberlain had to establish a separate plan to cover former GARD employees.

5.11 *Employer Arrangements*

(a) Seller will cause the GATX Corporation Non–Contributory Pension Plan for Salaried Employees ("GATX Plan") to transfer and Buyer will assume all the liabilities for pension benefits arising under the GATX Plan with respect to the Division's salaried employees that are transferred to Buyer ("GARD Employees"). Buyer will establish a separate pension plan ("Chamberlain–GARD Plan") to cover GARD Employees, which pension plan will be substantially the same as the Buyer's pension plan ("Chamberlain Plan") subject to the following:

(i) All GARD Employees will be granted service credit under the Chamberlain–GARD Plan for purposes of eligibility, vesting and determining benefits for all Seller service to the same extent as credited for such purposes under the GATX Plan.

(ii) Benefits under the Chamberlain–GARD Plan will in no event be less than, with respect to each GARD Employee, such GARD Employee's accrued benefit

under the GATX Plan as of the date of closing ("Closing Date")....

Exh.32, Section 5.11.

### 4. *GATX Tank Erection Corporation*

168. Prior to June 28, 1984, GATX Tank Erection Corporation ("TEC"), an affiliated company under the Plan, was a wholly-owned subsidiary of GATC and a second-tier subsidiary of GATX Corporation. TEC operated facilities in Birmingham, Alabama; Houston, Texas; East Chicago, Indiana; and Orem, Utah. S.149.

169. On June 28, 1984 GATX sold certain assets of TEC to Brown–Minneapolis Tank & Fabricating Co. ("Brown–Minneapolis") pursuant to an asset purchase agreement. S.150 & Exh.33.

170. Until June 28, 1984, of the approximately 135 TEC employees, 97 salaried employees were participants in the Plan. S.151.

171. As required by Section 6.2 of the asset purchase agreement, TEC terminated or laid off all employees at its Birmingham, Houston, East Chicago, and Orem facilities on or before June 28, 1984. On or about June 28, 1984, TEC ceased production and substantially all of its activities at these facilities. The only TEC facility to reopen was the Birmingham facility, where Brown–Minneapolis started up operations again approximately three-six months after the sale. S.152, 153, Exh.33.

172. Brown–Minneapolis advised GATX that it was considering hiring some former TEC employees. Neither GATX nor TEC nor the Plan, however, received written notice from Brown–Minneapolis that it intended to hire any former TEC employees. Brown–Minneapolis had made no commitment to GATX to hire any TEC employee at the time of the asset sale. S.154.

173. GATX retained an outplacement firm, Eastman & Borne Associates, to assist former TEC employees in obtaining new employment. S.155.

174. The Plan processed applications by TEC employees with qualifying age and service for 75/80 point benefits. S.156.

175. As far as the Plan is aware, Brown–Minneapolis subsequently rehired very few former TEC employees over a period of several months following the sale. S.157.

176. Samuel Kohler, then Plan Administrator, regarded those TEC employees who obtained employment at Brown–Minneapolis as having obtained entirely new employment, rather than continuing employment with TEC. S.158.

177. At the time the Plan decided to permit TEC employees who qualified to elect a 75/80 point retirement option, GATX and TEC officers (*i.e.*, Mr. Finkelman and Mr. Krick) knew that Brown–Minneapolis was considering hiring some TEC employees. S.159.

178. On June 21, 1984 Mr. Krick sent Mr. Finkelman a memorandum listing TEC employees whom Brown–Minneapolis wished to retain. S.160 & Exh.34.

179. The following TEC employees received benefits pursuant to the 75/80 retirement option, under the "plant shutdown" category: Billy J. Daniel, Gene L. Deason, Charles S. Hanley, Jr., Edwin J. Lodygowski, Charles C. Miller, William H. Reed, Robert C. Rogers, McBurnett Rutland, Alphonsas Snarskis, Evart J. Underhill, and Marvin C. Woeltje. S.163.

180. Of the TEC employees who received benefits pursuant to the 75/80 retirement option, Brown–Minneapolis hired two individuals, Gene L. Deason and Charles C. Miller, and offered a third, Edwin J. Lodygowski, a position which he did not accept. S.164.

181. Gene L. Deason's and Charles C. Miller's effective retirement date from TEC was July 1, 1984. Edwin Lodygowski's effective retirement date from TEC was August 1, 1984. S.165.

182. Eugene Ruark was a TEC employee who, as of June 28, 1984, did not have sufficient age and years of service to qualify for 75/80 point retirement. S.166.

183. TEC management initially made the decision to place Eugene Ruark on layoff status until December 1, 1984, at which point he would have qualified, in terms of age and years of service, for a 75/80 point pension retirement. S.167.

184. Mr. Krueger revoked the decision to place Eugene Ruark on layoff status

when it was discovered that Mr. Ruark had been involved in some alleged thefts of company assets. S.168.

### 5. *Richmond*

185. GATX Tank Storage Terminals Corporation is a wholly-owned subsidiary of GATX Terminals Corporation and an affiliated company under the Plan. S.169.

186. Prior to September 20, 1984, GATX Tank Storage Terminals Corporation operated tank and warehouse storage facilities in Richmond, California ("Richmond Terminal"). S.170.

187. On September 20, 1984 GATX Tank Storage Terminals Corporation sold Richmond Terminal to Unitank Terminal Service. S.171.

188. Until that date, approximately nine Richmond facility salaried employees were participants in the Plan. S.172.

189. No employees ceased working at the Richmond Terminal on September 20, 1984. The Plan Administrator understood that Richmond Terminal employees would continue to work at the facility after the sale. S.173.

190. Richmond Terminal remained open for business and continued its operations immediately following the sale. S.174.

191. The asset purchase agreement for the Richmond Terminal transaction provided that

[t]o the extent permitted by law, Buyer will recognize and allow credit for each nonbargaining unit Transferred Employee's years of service with GATX for purposes of determining each nonbargaining unit Transferred Employee's eligibility to participate in, and benefits under, any of Buyer's employee benefit plans....
Exh.87.

192. On or about September 10, 1984, two Richmond Terminal employees with sufficient age and service, Charles Jones and Frank Tetzschner, applied for 75/80 point benefits as a result of the sale. They were the only Richmond employees who applied for 75/80 point benefits. S.175.

193. The Plan Administrator determined that Jones and Tetzschner were not

entitled to 75/80 point pensions. The employees did not appeal the Administrator's determination. S.176.

194. In a letter dated March 28, 1985, to Norman Leonard, counsel for Mr. Jones and Mr. Tetzschner, Mr. Herbert explained that "the Richmond Terminal was not permanently shutdown but purchased by Unitank and continued to operate," and that, since Unitank employed Jones and Tetzschner, they were never placed on layoff. Exh.51.

### 6. *GATC*

195. GATC is an affiliated company under the Plan. S.177.

196. Mr. Herbert testified at deposition that the GATC Sharon, Pennsylvania plant was closed over a period of time. As the plant discontinued its operations, no work was available, and the Sharon plant employees qualified for 75/80 retirement. S.178.

### K. Plan Treatment of Other Employees

197. Prior to 1980, Robert Soha was the Controller at Fuller's Catasauqua Plant. At some point it was determined that Mr. Soha was not performing adequately, so he was offered a transfer to corporate headquarters to a lower job position. Management also gave Mr. Soha the option of retiring under the 75/80 Point Retirement Option, effective June 1, 1982. Mr. Soha elected to take the 75/80 Point Retirement Option. Mr. Herman testified at deposition that Mr. Soha retired under the "extenuating circumstances" provision of the 75/80 Point Retirement Option under the Plan. The Plan records indicate that Mr. Soha was terminated as a result of a layoff. S.S.51 & Exh.58.

198. Roger Flores was an employee who worked at Fuller headquarters. Mr. Flores was on layoff for two years and then was terminated. At that point, November 1, 1983, he retired under the 75/80 Point Retirement Option. S.S.52.

199. Virgil B. Spence was a GATC employee who received a 75/80 Retirement Option in conjunction with the termination of his employment with GATC. S.S.53 & Exh.59.

200. Donald E. Laub was a GATX employee who worked in the custom fabrication division at East Chicago, Indiana. Mr. Laub retired on January 1, 1974, and was granted a 75/80 retirement benefit under the "mutually satisfactory conditions" of Section 2.3 of the Plan in effect as of that date. S.S.60 & Exhs.47 & 66.

201. K.H. Chang was an MTL employee who retired in 1974 and was granted a 75/80 retirement option under the "mutually satisfactory conditions" provisions of Section 2.3 of the Plan in effect as of that date. S.S.61 & Exhs.47 & 67.

202. Doris T. Anderson was an employee who was granted a 75/80 Point retirement option and who retired on January 1, 1966. Mrs. Anderson was granted the 75/80 option under Section 2.3 of the Plan in effect as of that date. S.S.57 & Exhs.47 & 63.

203. Felix Szczudlak was an employee of General American Transportation Corporation who was granted a 75/80 retirement benefit under the "mutually satisfactory conditions" provision of Section 2.3 of the Plan in effect as of the date he retired, August 1, 1967. S.S.64 & Exhs.47, 71, & 72.

204. Helen A. Lindquist was an employee at GATX's Chicago, Illinois office who was granted a 75/80 Retirement Option under Section 4.5(b) of the Plan. S.S.54 & Exh.60.

205. Exhibit 61 is a memo dated January 24, 1977 from L.J. Conti to J.J. Glasser (then the President of GATX Corporation) concerning a request to permit four salaried employees at the Carteret, New Jersey facility to be granted a 75/80 retirement option. Of the four individuals referenced on that memo, Stanley Masluch [sic (Masluck)] retired on April 1, 1977, with a 75/80 pension, under the "company discretion" provision of Section 4.5(b) of the Plan. Edward J. Riley retired on March 1, 1978 and received at 75/80 retirement benefit, under "company discretion" provision. F. Fitzpatrick retired on April 1, 1977, received a 75/80 retirement benefit, and retired under the company discretion provision. E. O'Donnell was not a salaried employee or a participant in the Plan. S.S.55 & Exh.61.

206. Mary Ann Duggan was a GATX employee who retired in 1985 and who was granted a 75/80 pension effective January 1, 1986 under the "company discretion" provision of Section 4.5(b) of the Plan. S.S.56 & Exh.62.

207. J.W. Allegrette was an employee who was granted a 75/80 retirement option under the "company discretion" provision of Section 4.5(b) of the Plan. S.S.58 & Exh.64.

208. Charles R. Loy was a GATX employee who, in late 1984, was granted a 75/80 retirement under Section 4.5(b) of the Plan. S.S.59 & Exh.65.

209. Joyce Bartus was an employee of American Steamship Company, which was once a subsidiary of GATX Corporation. Mrs. Bartus retired in March, 1979, and was granted a 75/80 pension under the company discretion provision of Section 4.5(b) of the Plan. S.S.62 & Exh.68.

210. Theodore Wang was an employee of Marine Purchasing Corporation who retired in 1977, receiving a 75/80 pension benefit under the "company discretion" provision of Section 4.5(b) of the Plan. S.S.63 & Exhs.69 & 70.

211. Harry M. Purvies was an employee who retired on August 1, 1977, and received a 75/80 retirement option under the "company discretion" provision of Section 4.5(b) of the Plan. S.S.65 & Exh.73.

212. Burton G. Ochampaugh was a GATX employee, who also served for some period of time as Plan Administrator, who retired effective July 1, 1980. In conjunction with the termination of his employment, Mr. Ochampugh received a 75/80 retirement under "company discretion" provision of Section 4.5(b) of the Plan. S.S.66 & Exh.74.

213. Harry Nelson was a Fuller employee who retired effective January 1, 1981 and who was granted a 75/80 retirement benefit under the "company discretion" provision of Section 4.5(b) of the Plan. S.S.67 & Exh.75.

214. Donald Pazdur was a GATX employee whose employment with GATX was terminated on February 13, 1981. In con-

junction with the termination of his employment, Mr. Pazdur was granted a 75/80 retirement benefit. S.S.68 & Exh.76.

### L. Miscellaneous Findings

215. Mr. Souders represents the subclass of Fuller employees who, as of December 31, 1986, qualified for 75/80 points retirement but did not qualify for the 55/15 benefit ("Souders subclass").

216. Messrs. Kotrosits and Ruggeri represent the subclass of Fuller employees who were coerced into filing for 55/15 early retirement but had sufficient age and years of service to qualify for the 75/80 benefit ("Ruggeri subclass").

217. At the time they retired, Messrs. Kotrosits and Ruggeri were close to qualifying for the enhanced 90 point retirement benefit. Mr. Kotrosits' combined age and service credit totalled 89.5833; Mr. Ruggeri's totalled 89.0833. If GATX had not sold Fuller, and these men had continued to work for Fuller, they would have been eligible for 90 point subsidized early retirement in a short period of time.

218. The MTL transaction differed from the Fuller sale in that it was a spinoff of the shares of the GATX subsidiary's stock to GATX stockholders. Unlike the Fuller transaction, the GATX shareholders received the MTL stock as a special dividend. GATX received no consideration in return for the shares.

219. The GARD asset sale differed from the Fuller sale in that the GARD asset purchase agreement provided for the transfer of the assets and liabilities of the Plan that related to GARD employees' pensions to the purchasing corporation. *See supra* page 1447. The agreement provided that the GARD employees pension plan would continue as before with no effect on the benefits received by those employees.

220. With respect to the TEC transaction, the Plan awarded 75/80 pensions to employees laid off pursuant to Section 6.2 of the asset purchase agreement even if those employees received job offers from Brown–Minneapolis, the buying corporation.

221. The Richmond Terminal transaction differed from the Fuller sale, because Richmond Terminal's buyer recognized and credited the employees' GATX service credit for purposes of its own plan. Therefore, the employees' pension rights continued unaffected by the sale.

222. The draft stock purchase agreement for the Fuller sale, prepared by GATX, provided that the Buyer would assume the assets and liabilities of the GATX plan that related to Fuller employees. The final purchase agreement provided the sale would result in the termination of the Fuller employees' participation in the Plan and imposed no obligation on the buyer to fund a plan for former Fuller employees.

223. The Plan Administrator made his determination that 75/80 benefits did not apply after the terms of the stock sale had been finalized. If the above-referenced change in language had required the award of 75/80 benefits, GATX could not have negotiated for a purchase price to reflect that change.

224. The GATX-appointed trustees were operating under a conflict of interest when they denied 75/80 benefits to the plaintiff employees.

## II. DISCUSSION

### A. Contentions of the Plaintiffs

The plaintiffs[2] challenge the defendant's denial of their applications for subsidized early retirement benefits payable as a result of the Fuller sale.[3] Specifically, the

---

2. Mr. Ruggeri represents the class of Fuller salaried employees who applied for 75/80 point retirement before December 31, 1986, but received only the actuarially reduced 55/15 benefit. Mr. Souders represents the class of Fuller salaried employees who requested 75/80 retirement prior to December 31, 1986 and who did not qualify for the actuarially reduced 55/15 benefit. Members of both subclasses had suffi-

cient age and service credit to qualify for a 75/80 point pension.

Originally, Mr. Kotrosits sought a 90 point pension under the terms of the Plan. *See* Complaint, Count V. He has apparently abandoned that claim and now seeks 75/80 benefits as a member of the Ruggeri subclass.

3. Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), provides that participants in

plaintiffs submit that the Plan Administrator and members of the GATX Benefits Committee violated ERISA in denying the plaintiffs' applications for 75/80 retirement benefits under Section 4.5, which provides for subsidized benefits when employment is terminated either at the discretion of the company or due to a layoff or plant shutdown. In support of their argument, the plaintiffs note that, as of closing time on December 31, 1986, they were unemployed.[4]

The plaintiffs contend that this court must review the benefit denial *de novo* because the Plan does not grant the trustees discretionary authority to construe the terms "layoff" or "plant shutdown." Plaintiffs' Supplemental Trial Memorandum ("P.Supp.Tr.Mem.") at 2. Alternatively, the plaintiffs argue that the Plan cannot enjoy the benefit of the more lenient abuse of discretion standard, because the Summary Plan Description fails to inform employees that review of the Administrator's decision will be limited in such a way. Plaintiffs' Reply to Defendant's Supplemental Trial Memorandum at 8. Finally, the plaintiffs submit that this court should grant them the requested relief even if it applies the abuse of discretion standard.

### B. Contentions of the Defendant

The defendant argues that Section 4.5 of the Plan agreement unambiguously precludes the award of a 75/80 pension under the circumstances of the Fuller sale. The defendant relies on the fact that, after the sale, Fuller continued as a going concern. On January 2, 1987 the new entity offered employment to all representative plaintiffs. Defendant's Trial Memorandum ("D.Tr.Mem.") at 10. Moreover, old Fuller employees, once rehired post sale, were covered by a plan adopted by the new Fuller company. D.Tr.Mem. at 11, S.51, Exh.7 at 1.

The defendant avers that the Plan Administrator, Mr. Herbert, and the GATX Benefits Committee ("Committee") based the decision to deny 75/80 benefits on entirely appropriate considerations. The trustees understood that Fuller was sold as an ongoing business. Additionally, in Mr. Herbert's view, the Plan had not treated prior sales of control as triggering 75/80 benefits. D.Tr.Mem. at 21–28. Mr. Herbert also consulted with the Plan's attorneys, the prior Plan administrator, and the Personnel Manager. All of these individuals concurred in the conclusion that the Fuller sale did not trigger the benefits in Section 4.5. D.Tr.Mem. at 14–15. According to the defendant, the Plan fiduciaries reasonably based their decisions on all of the above factors. For these reasons, the defendant urges that this court affirm its denial of benefits to the plaintiff class members.

The defendant also maintains that Section 8.3 of the Plan precludes *de novo* review of the Plan Administrator's or the Committee's decision. Defendant's Supplemental Trial Memorandum ("D.Supp.Tr.Mem.") at 3. Section 8.3 states, in relevant part,

> The Committee on behalf of the Participants and all other Beneficiaries of the Plan and Trust shall enforce the Plan in accordance with the terms of the Plan and the Trust Agreement and shall have all powers necessary to accomplish that purpose, including but not by way of limitation, the following:
>
> . . . .
>
> (b) To construe The Plan and Trust Agreement;
> (c) To determine all questions arising in its administration, including those relating to the eligibility of persons to become Participants; the rights of Participants and their Beneficiaries; and its decision

pension plans may bring civil suits to enforce ERISA.

**4.** The plaintiffs proceed on four theories: first, that the Ruggeri and Souders subclasses ceased being GATX employees as of December 31, 1986 and, therefore, were laid off; second, that the December 31, 1986 sale resulted in the involuntary termination, that is layoff, of the Ruggeri

and Souders subclasses; third, that the threat of loss of medical and life insurance benefits forced members of the Ruggeri subclass to retire, resulting in an effective layoff; and fourth, that the one to two day layoff of both the Ruggeri and Souders subclasses manifests a clear intent to reduce forces at Fuller Company in conjunction with the stock sale. Plaintiffs' Refiled Trial Memorandum at 19–20.

thereon shall be final and binding upon all persons hereunder.

. . . .

Exh. 13, Article 8.

In analyzing the parties' contentions, this court must turn first to the question of standard of review.

## C. Analysis of the Parties' Contentions

### 1. *Standard of Review*

■ The Supreme Court enunciated the standard for reviewing a denial of benefits challenged under § 502(a)(1)(B) of ERISA in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *Firestone* rejected the wholesale importation of the arbitrary and capricious standard developed in pension cases arising under the Labor Management Relations Act, 29 U.S.C.A. § 186(c) ("LMRA") into ERISA. 489 U.S. at 109, 109 S.Ct. at 953.[5]

■ The Court counselled that because principles of trust law govern federal court review of benefit decisions by plan trustees, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115, 109 S.Ct. at 956. If the plan document grants the trustee discre-

tionary authority, courts must review fiduciary decisions for abuse of discretion. 489 U.S. at 111, 109 S.Ct. at 954; *see also Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 119 & n. 5 (3d Cir.1990); *Brown v. Blue Cross and Blue Shield, Inc.*, 898 F.2d 1556, 1558 n. 1 (11th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1187–88 (4th Cir.1989); *Batchelor v. International Bhd. of Elec. Workers Local 861 Pension and Retirement Fund*, 877 F.2d 441, 442 (5th Cir.1989).

■ With regard to the appropriate standard of review, this court must agree with the defendant. Because Section 8.3 invests in the trustees discretion to interpret the Plan, the Committee's decision must stand absent an abuse of discretion. *See Stoetzner*, 897 F.2d at 119 & n. 5 (arbitrary and capricious[6] standard applies when plan provides that "decisions of the [trustee] shall be final and conclusive as to all questions of interpretation and application of these Pension Rules and as to all other matters arising in the administration thereof"); *see also Foster McGaw Hosp. v. Building Material Chauffeurs Welfare Fund Local 786*, 925 F.2d 1023, 1026 (7th Cir.1991) (deferential review required when trustees have power to determine all questions arising in administration, interpretation and ap-

---

**5.** Under the LMRA, unions and employers may set up pension plans jointly "for the sole and exclusive benefit of the employees. . . ." 29 U.S.C. § 186(c). Because the LMRA does not provide for judicial review of determinations by plan trustees, federal courts adopted the arbitrary and capricious standard as a means of asserting jurisdiction over suits alleging that the trustees had not complied with § 186(c). *Firestone*, 489 U.S. at 109, 109 S.Ct. at 953 (citing *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052 (7th Cir.1987)). Moreover, LMRA plans are administered by representatives of the employees as well as the employer. Deferential review is therefore more appropriate for LMRA plans than for ERISA plans administered by the employer only.

**6.** Some courts equate the "arbitrary and capricious" and "abuse of discretion" standards, and others distinguish them. *Compare Stoetzner*, 897 F.2d at 119 ("the arbitrary and capricious standard [applies] because the plan contains provisions which give the administrator discretion in making eligibility determinations") *and Newell v. Prudential Ins. Co.*, 904 F.2d 644, 650

(11th Cir.1990) (stating that *Firestone* mandates application of the arbitrary and capricious standard when plan instrument gives the trustee discretion) *and Johnson v. Enron Corp.*, 906 F.2d 1234, 1238 (8th Cir.1990) (same) *with Jordan v. Cameron Iron Works, Inc.*, 900 F.2d 53, 56 n. 1 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990) (proper standard under *Firestone* is abuse of discretion) *and De Nobel*, 885 F.2d at 1187 (*Firestone* mandated total abandonment of arbitrary and capricious standard). *See also Rizzo v. Caterpillar, Inc.*, 914 F.2d 1003, 1008 (7th Cir.1990) (arbitrary and capricious, not abuse of discretion, is applicable standard of review when trustee given discretionary authority).

The *Firestone* Court was concerned less with the distinction between "arbitrary and capricious" and "abuse of discretion" than with the distinction between *de novo* and deferential review. Following our Court of Appeals in *Stoetzner*, this court will use both terms to refer to judicial review which is largely deferential.

plication of plan); *Morales v. Pan Am. Life Ins. Co.*, 914 F.2d 83, 88 (5th Cir.1990) (abuse of discretion standard applies when plan document grants discretion to construe the Plan, determine eligibility, authorize disbursements, compute benefits and perform such other duties as required); *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990) (abuse of discretion standard applies when trustees have power "to construe and interpret the plan"); *Batchelor*, 877 F.2d at 443 (5th Cir.1989) (abuse of discretion standard applies when plan provides that the Trustees "have full and exclusive authority to determine all questions of coverage and eligibility [and] full power to construe the provisions of this Agreement, [and] the terms used herein, [and to] interpret the Plan and ... determine all questions arising in the administration, interpretation and application of the Plan"); *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 39 (11th Cir.1989) (arbitrary and capricious standard applies when the plan confers "full and exclusive authority to determine all questions of coverage and eligibility and full power to construe the provisions of [the] Trust" on the trustees); *Ferrara v. Allentown Physician Anesthesia Assoc., Inc.*, 711 F.Supp. 206, 209 (E.D.Pa.1989) (arbitrary and capricious standard applies when the plans provide that the administrator "shall administer the Plan in accordance with its terms and shall have the power to determine all questions arising in connection with the administration, interpretation, and application of the Plan").

This court's inquiry does not end, however, merely because the Plan document grants the trustees discretion. Were that the case, a plan sponsor would be able to eliminate all protection of pension rights simply by including a clause in the plan document granting discretion to sponsor-appointed trustees. Such a limited inquiry would undermine ERISA, legislation aimed

primarily at the protection of pension rights. *Cf. Firestone*, 489 U.S. at 113–14, 109 S.Ct. at 955–56 (rejecting arbitrary and capricious standard because it would "require [the Court] to impose a standard of review that would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted").

■ Recognizing the possibility of administrative bias on the part of sponsor-appointed trustees, the *Firestone* court established a standard of review that would take any such bias into account. Specifically, the Court stated that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" 489 U.S. at 115, 109 S.Ct. at 956 (citing Restatement (Second) of Trusts § 187, comment d (1959)). Thus, any court reviewing an ERISA trustee's decision must determine whether the trustees had a conflict of interest when they made a benefits determination.

### 2. *Identifying the Conflict of Interest*

■ The *Firestone* Court "prescribed rules for judicial review of ERISA benefit denials which effectively supplanted [earlier approaches]—but without rejecting all the concepts of review embodied in those approaches." *De Nobel*, 885 F.2d at 1185. The Court's instruction with regard to conflict of interest simply mandates the continuation of pre-*Firestone* inquiries into administrative bias. *See De Nobel*, 885 F.2d at 1184 (courts, prior to *Firestone*, took administrative bias into account without abandoning arbitrary and capricious formulation). To the extent that courts analyzed administrative bias in applying the arbitrary and capricious standard of review, pre-*Firestone* cases can offer guidance for the determination of what constitutes a conflict of interest for the sponsor-appointed [7] trustee of a plan.

---

7. The fact that an agent, employee, or representative of the plan sponsor has discretionary authority to determine benefits does not *per se* establish an impermissible conflict of interest. ERISA allows the appointment of representatives of a party in interest to administer pension plans. 29 U.S.C. § 1108(c)(3) ("[n]othing in section 1106 of this title [describing prohibited

transactions involving impermissible conflicts of interest] shall be construed to prohibit any fiduciary from ... serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest."); *see also Newell v. Prudential Ins. Co.*, 904 F.2d 644, 649 (11th Cir.1990). However, under certain circumstances, trustees appointed by an inter-

Although, in theory, review for arbitrary and capricious behavior required approval of any reasonable interpretation of the plan, in practice most courts took a less deferential approach when there was a probability of administrative bias. *Compare Shiffler v. Equitable Life Assur. Soc'y*, 838 F.2d 78, 83 (3d Cir.1988) (decision to deny benefits reviewed for clear error or irrationality) *and Teeter v. Supplemental Pension Plan of Consolidated Rail Corp.*, 705 F.Supp. 1089, 1095 (E.D. Pa.1989) (when no unusual circumstances present, arbitrary and capricious standard requires review for clear error or irrationality) *with Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052–53 (7th Cir.1987) (Posner, J.) (because arbitrary and capricious standard is a range and not a point, it makes necessary adjustments for possible bias) (citing cases) *and Dockray v. Phelps Dodge Corp.*, 801 F.2d 1149, 1152 (9th Cir.1986) (citing *Jung v. FMC Corp.*, 755 F.2d 708, 711–12 (9th Cir.1985)) (where there is serious conflict between interests of employer and fund beneficiaries, less deference afforded to employer-appointed administrator of employer-administered fund).

In employing a deferential standard of review, the federal judiciary recognizes that trustees are often called on to balance the competing interests of different beneficiaries. As stated in *De Nobel*,

> [f]iduciaries are obligated to act not only in the best interests of beneficiaries, but with due regard for the preservation of trust assets. Adverse benefits determinations may well have saved considerable sums, but that may simply reflect that the trustees, bearing in mind the interests of *all* participants and beneficiaries, 29 U.S.C. § 1104(a)(1), made a considered decision to preserve the corpus of the trust, rather than grant a

doubtful claim. This the statute affirmatively contemplates; and standing alone it clearly suggests no "presumptive bias."

885 F.2d at 1191; *see also Shiffler*, 838 F.2d at 83; *Geib v. New York State Teamsters Conference Pension and Retirement Fund*, 758 F.2d 973, 978 (3d Cir.1985) (trustees given broad discretion to act to conserve assets for future beneficiaries); *Edwards v. Wilkes–Barre Pub. Co. Pension Trust*, 757 F.2d 52, 56 (3d Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 130, 88 L.Ed.2d 107 (1985) (trustees must necessarily balance the interests of different beneficiaries); *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984) (trustee must balance interests of present and future beneficiaries); Johnson, *Judicial Review of ERISA Plan Administration Under the Arbitrary and Capricious Standard of Review*, 10 Indus.Rel.L.J. 400, 406 (1988) (because fiduciary owes duty to present and future beneficiaries, duty can cut toward either granting or denying benefits).

Moreover, because employees will accept lower wages in return for secure, well-defined pension rights, plan sponsors have incentives to avoid the assignment of lower values to benefits. *Van Boxel*, 836 F.2d at 1051 ("the less an employee's pension rights are worth, the higher are the wages that he will demand"); Fischel & Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule*, 55 U.Chi.L. Rev. 1105, 1117 (1988) (citing R. Ehrenberg & R. Smith, *Modern Labor Economics: Theory and Public Policy* 394–406 (3d ed. 1988)) ("Employees pay for pension benefits in the form of lower wages"); *cf. Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134, 145 (3d Cir.1987), *rev'd on other grounds, Firestone, supra* (citing *In-*

---

ested party are operating under a serious conflict of interest.

The Third Circuit Court of Appeals has recognized in dictum that, under certain circumstances, representatives of a plan sponsor serving as fiduciaries may face a conflict of interest. In rejecting the argument that plan fiduciaries may never consult the employer's in-house counsel in making benefits decisions, the court noted that specific circumstances "might estab-

lish some reason why these particular fiduciaries should not be allowed to make decisions" as envisaged by the plan. *Ashenbaugh v. Crucible, Inc. 1975 Salaried Retirement Plan*, 854 F.2d 1516, 1531 n. 10 (3d Cir.1988), *cert. denied*, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989) (emphasis supplied). The plaintiffs in *Ashenbaugh* made no showing of specific circumstances establishing a potential conflict of interest.

*land Steel Co. v. N.L.R.B.*, 170 F.2d 247, 253 (7th Cir.1948)) (pension as much a part of employee's wages as money paid at the time of rendition of services).[8] Additionally, bad faith pension decisions can affect employee morale. Thus, "the impact on the company's welfare of granting or denying an individual application for a pension will usually be too slight to compromise the impartiality of the trustees, even if all are appointed by the company." *Van Boxel*, 836 F.2d at 1051. However, "if the denial of an application is on grounds disqualifying a vast number of applicants, or if the company is not interested in the long run because it is about to go out of business, any presumption of neutrality [of employer-appointed trustees] may fail." *Van Boxel*, 836 F.2d at 1051. Having defined conflict of interest generally, this court will now examine the position of the GATX trustees in particular.

### 3. *Conflict of Interest and the GATX Trustees*

 If the Plan had allowed the 75/80 benefits, GATX would have faced increased liabilities as Plan sponsor.[9] Defined benefit plans such as the GATX Plan require the sponsor to pay a retirement pension based on certain variables, and the sponsor remains liable to pay the benefits if the fund turns up short. In other words, the sponsor guarantees the actuarial soundness of the plan. Fischel & Langbein, 55 U.Chi.L.Rev. at 1112–13. Thus, at the time of the benefits decision, GATX had a contractual obligation that it had to honor, and "the wealthier the fund is, the less likely is the company to be called on to ante up pension money out of its own pocket." *Van Boxel*, 836 F.2d at 1050–51.

Mr. Herbert, the Plan Administrator who made the initial determination that the plaintiffs did not qualify for subsidized early retirement, is Director of Employee Benefits for GATX. The Committee, which approved *pro forma* the Administrator's decision, consists entirely of GATX officers. *See* Finding of Fact 131 (Committee consists of Chairman and CEO of GATX, Vice President and General Counsel of GATX and Vice President of Human Resources of GATX). If the interests of GATX clashed with the interests of the plaintiffs, the Plan fiduciaries were operating under a conflict of interest. *See, e.g., Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 694 (6th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990); *cf. Struble v. New Jersey Brewery Employees Welfare Trust Fund*, 732 F.2d 325, 333–34 (3d Cir.1984) (where gravamen of complaint is not that trustees have incorrectly balanced valid interests, but rather that they have sacrificed valid interests to advance the interests of non-beneficiaries, less deferential review appropriate).

Although the expense imposed on the sponsor of a fully funded plan will not usually create cause for searching judicial review, *see De Nobel*, 885 F.2d at 1191, the potential for a conflict of interest unquestionably existed under the unique circumstances of this case. Because GATX had just sold Fuller, it had no incentive to consider the effect of the benefits decision on the morale and productivity of Fuller employees. Moreover, the fact that the denial affected a large number of employees and resulted in estimated savings of at least two million dollars for the Plan undermines the rationale for deferential review. The larger the expenditure, the greater the possibility that the sponsor will eventually have to replenish the Plan's funds. *See Van Boxel*, 836 F.2d at 1050–51.

---

**8.** The opinion in *Bruch* was reversed in part by the *Firestone* opinion. The *Bruch* court held that the existence of a conflict of interest justified *de novo* review of an administrator's decision. 828 F.2d at 145. The Supreme Court reversed, holding that the motivations of plan administrators and fiduciaries are not relevant to the determination of the proper standard of review. 489 U.S. at 115, 109 S.Ct. at 956–57. *See Petrilli v. Drechsel*, 910 F.2d 1441, 1445 (7th Cir.1990) (Supreme Court upheld determination that *de novo* review applied on different grounds). The *Firestone* Court did not rule that the Court of Appeals' guidance for determining when a conflict of interest exists was incorrect.

**9.** Although Fuller employed the plaintiffs, GATX (Fuller's parent) sponsored the Plan and guaranteed its actuarial soundness.

Furthermore, the inferences of bad faith apparent here mandate less deferential review. *See Bruch,* 828 F.2d at 140 (citing *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 314 (5th Cir.1982)). GATX instructed its managerial staff not to tell Fuller employees whether they would have jobs after the sale. In spite of its concerted effort to ensure that employees would make their retirement decisions without full information, the Plan now asserts that the employees simply "[made] their economic decisions." Transcript of December 16, 1988 Hearing at 46. The Plan trustees also coerced the plaintiffs into accepting actuarially reduced benefits by threatening the loss of lifetime medical and life insurance benefits.[10] This is not good faith behavior.

Moreover, the Plan trustees considered prior corporate sales in making their determination without acknowledging that those sales were structured differently than the Fuller sale. Mr. Herbert and the Committee based the benefits decision, in part, on their assertion that the Fuller transaction resembled the MTL, Richmond Terminal, and Gard transactions. *See* Finding of Fact 134. In fact, an examination of the prior transactions reveals that they were all unlike the Fuller sale.

In the MTL transaction, GATX spun off the shares of its wholly-owned subsidiary as a special dividend to GATX shareholders. There was no interruption in the plaintiff's employment for pension purposes. Additionally, Mr. Herman, the Plan Administrator at the time of the transaction, testified at deposition that he thought Section 4.5 would not apply because "the spin-off of this subsidiary to shareholders would not constitute a triggering event under the provisions of the pension fund." *See* Exh.81. Clearly, that reasoning does not apply to the Fuller sale, which was not a spinoff of stock. The Richmond Terminal and GARD transactions differed from the Fuller sale in that the purchase agreements provided for the assumption of the assets and liabilities of the pension plan by the buyer.

Thus, in the prior instances where the Plan denied 75/80 benefits, the employees continued working for the new owner with their pension rights largely unaffected by the sale or spinoff. In spite of this fundamental difference between the earlier transactions and the Fuller sale, the Plan trustees relied heavily on those prior transactions to justify their denial of benefits in this case.

The Plan fiduciaries also based the denial on the fact that the new Fuller Company re-hired the plaintiffs, even though nothing in the Plan makes receipt of the enhanced benefit contingent on unemployment. The Plan clearly knew how to condition benefits on lack of employment. On March 14, 1986, GATX amended the severance pay plan to clarify that severance benefits were not available for employees who had the opportunity for continued comparable employment with subsidiaries that were sold

---

**10.** The defendant attempts to justify its actions with regard to the welfare benefits by asserting that, because the insurance benefits were unprotected, the Plan could have revoked them at any time. D. Tr. Mem. at 5, n. 5; D.Supp. Trial Mem. at 13, n. 14. The defendant is correct that welfare benefits "are exempt from the more stringent ERISA requirements." *Reichelt v. Emhart Corp.,* 921 F.2d 425, 429 (2d Cir.1990) (citing *Young v. Standard Oil (Indiana),* 849 F.2d 1039, 1045 (7th Cir.), *cert. denied,* 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1981)). *See* 29 U.S.C. § 1051(1); *Howe v. Varity Corp.,* 896 F.2d 1107, 1109 (8th Cir.1990); *see also* McNeil, *The Failure of Free Contract in the Context of Employer–Sponsored Retiree Welfare Benefits: Moving Towards a Solution,* 25 Harv.J. on Legis. 213 (1988) (discussion of the problem of unprotected retiree benefits and proposal for legislative solution). Although ERISA does not regulate the vesting of retiree insurance, the Plan's use of those benefits to pressure the plaintiffs into accepting actuarially reduced benefits contributes to this court's determination that the Plan acted in bad faith. It is also noted that the Stock Purchase Agreement required F A Holding to cause Fuller to reimburse GATX for up to $600,-000 of the costs of retiree benefits granted to Fuller salaried employees who retired as a result of the Fuller sale.

Obviously, the coercion apparent here affected only the Ruggeri subclass, the plaintiffs who were denied 75/80 benefits but received the actuarially reduced 55/15 pension. The bad faith apparent in the Plan's dealings with the Ruggeri subclass plaintiffs, however, also taints the denial of 75/80 benefits to the Souders subclass, the plaintiffs who could not retire under the 55/15 option.

## 1458

by GATX as going concerns. *See* Finding of Fact 140.

Finally, the Plan trustees also claim to have considered the fact that the employees would be covered under a new Fuller pension plan. In fact, at the time the trustees made their decision, Fuller had not yet adopted its new plan.[11] Additionally, Fuller had no contractual obligation to adopt any plan. Therefore, the trustees could not have considered the new plan, which did not exist at the time, in making their decision.

For these reasons, I reject the defendant's contention that GATX had no interest in the Committee's disposition of the plaintiffs' pension claims. This court finds that, under the special circumstances of this case, the GATX employees who served on the Committee had a conflict of interest. Therefore, the standard of review used must "integrat[e] factors such as self-interest into the legal standard for reviewing benefits determinations." *Brown,* 898 F.2d at 1561.

### 4. *The Integrated* Firestone *Standard*

*Firestone* changed the legal landscape for ERISA decisions. This court, in attempting to implement the proper standard of review, will look to post-*Firestone* decisions in other circuits, as well as pre-*Firestone* concepts of review consistent with the *Firestone* standard.

The Eleventh Circuit Court of Appeals has announced a standard for reviewing an ERISA fiduciary's benefit determinations that takes self-interest into account. The court wrote that "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected ... beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Brown,* 898 F.2d at 1561—62 (cited in *Newell,* 904 F.2d at 651);[12] *see also Poole v. Seattle–First Nat'l Bank,* 741 F.Supp. 837, 844—46 (E.D.Wash.1990) (adopting the same approach).

■ Using the *Brown* approach, if the reviewing court has determined that a conflict of interest exists, it must then ascertain the correct interpretation of the plan at issue.[13] Pre-*Firestone* courts employing the arbitrary and capricious standard, but considering administrative bias, undertook a similar inquiry:

> When the members of the tribunal—for example, the trustees of a pension plan—have a serious conflict of interest, the proper deference to give their decisions may be slight, even zero; the decision if wrong may be unreasonable. The less likely it is that the trustees' judgment was impaired by their having a stake, however indirect, in the outcome, the less inclined a reviewing court will be to override their judgment unless strongly convinced they erred.

*Van Boxel,* 836 F.2d at 1052.

Having made the initial determination that a conflict of interest existed, this court will use the *Brown* approach to ascertain whether there was an abuse of discretion. The *Brown* test is consistent with the purposes of ERISA and the Supreme Court's holding in *Firestone.* Using this approach,

---

**11.** The Plan Benefits Committee affirmed the denial of 75/80 benefits on June 8, 1987. The new Fuller Company adopted its Retirement Plan, retroactive to January 1, 1987, on July 30, 1987.

**12.** In adopting this standard, the Court of Appeals simply extended a federal common law rule developed under the LMRA. *Brown,* 898 F.2d at 1562 (citing cases). Although the theoretical underpinnings for discretionary review differ under the LMRA and ERISA, the two statutes impose similar duties of loyalty. *Compare* 29 U.S.C. § 1104(a) *with* 29 U.S.C. § 186(c)(5). Therefore, LMRA decisions can inform the development of ERISA jurisprudence.

**13.** Other Courts of Appeals have held that post-*Firestone* deferential review for abuse of discretion requires the court to assess initially whether the plan fiduciary made an error in interpretation. *See Pratt v. Petroleum Prod. Management Employees' Savings Plan,* 920 F.2d 651, 659–61 (10th Cir.1990) (employing deferential standard, court assessed whether trustee interpretation of plan was correct); *Jordan v. Cameron Iron Works, Inc.,* 900 F.2d 53, 56 (5th Cir. 1990) (court must determine legally correct interpretation, and if the administrator's decision is not legally correct, court must ascertain whether there was an abuse of discretion); *cf. Ziaee v. Vest,* 916 F.2d 1204, 1208 (7th Cir.1990) (plan's decision must stand unless erroneous).

the next question posed is whether the Plan's interpretation of Section 4.5 was incorrect.

### a. Layoff or Mere Termination?

It is undisputed that the plaintiffs suffered a termination of employment. The stock purchase agreement provided that "the Closing Date hereunder is a Termination of Employment under the terms of the GATX Salaried Pension Plan for all Fuller participants." Exh. 13 § 5.10(b), at 25. The parties disagree only with regard to the nature of that termination.

The plaintiffs contend that their termination amounted to a layoff. They left work on December 31, 1986 jobless. They remained unemployed, albeit for a short period of time, until called back on the first working day of 1987.[14]

The defendant argues that, although terminated, the plaintiff employees were not laid off because they never missed a day of work. According to the defendant Plan, this situation cannot constitute a layoff:

> Neither plaintiffs nor the other class members were, themselves, deprived of a job. Plaintiffs are left to argue that they were concerned and uncertain about whether they would be able to keep their jobs, and that GATX Corporation had no assurance from F A Holding Corporation that all Fuller Company employees would keep their jobs. Such concerns, however, do not constitute a layoff.

D.Tr.Mem. at 3.

 Although concern about future employment does not constitute a layoff, temporary suspension of employment at the will of an employer certainly does. In *CBS Inc. v. International Photographers of the Motion Picture Industries, Local 644*, 603 F.2d 1061 (2d Cir.1979), the court, in explaining the distinction between layoff and discharge, defined the term layoff as used in labor relations.

> The ordinary meanings of the terms discharge and layoff have long been recog-

nized by the courts. A discharge normally means the "termination of the employment relationship or loss of a position." *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 286, 66 S.Ct. 1105, 1112, 90 L.Ed. 1230 (1946). A layoff, on the other hand, is ordinarily a "period of temporary dismissal;" **inherent in the term is the anticipation of recall.** *Id.* at 287 n. 11 & 286—87, 66 S.Ct. at 1112 n. 11, & 1111–12; *accord, Lord Mfg. Co. v. Nemenz*, 65 F.Supp. 711, 723 (W.D.Pa.1946); *see Acme Indus. Co.*, 227 N.L.R.B. 249 (1976).

603 F.2d at 1063 (emphasis supplied); *see also Barnhart v. Compugraphic*, No. 88–8441, 1989 WL 133123, 1989 U.S. Dist. Lexis 13521, * 4 (E.D.Pa. Nov. 2, 1989), *aff'd mem.*, 908 F.2d 961 (3d Cir.1990); *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1131 (N.D.Ill.1986) (term layoff implies a separation not as final as discharge); *International Alliance of Theatrical Stage Employees v. Gulf Int'l Cinema Corp.*, 568 F.Supp. 1396, 1399 (E.D.La.1983) (layoff is no more than suspension of work of an individual employee).

 The fact that the plaintiffs knew they might be recalled to their jobs by the new Fuller Company only supports the conclusion that a layoff occurred when their employment was temporarily suspended. Because a temporary suspension with the possibility of recall is the quintessential layoff, the suspension of the plaintiffs' employment on December 31, 1986 constituted a layoff.

The defendant's reliance on cases upholding the denial of severance pay when a corporation is sold is unavailing for two reasons. First, our Court of Appeals has recognized that employees in that situation may be eligible to receive severance pay. *Ulmer v. Harsco Corp.*, 884 F.2d 98, 104 (3d Cir.1989) (Higginbotham, J.). Second, severance pay serves a different purpose than pension benefits. Severance policies are designed to provide temporary salary

---

**14.** Members of the Ruggeri subclass received telephone calls on the first working day of 1987 calling them back to work. Technically, members of the Souders subclass were not "called back" to work. They were told to report to their job sites, although they did not know whether the new Fuller Company would employ them. Thus, although they reported to their job sites, members of the Souders subclass were not employed prior to the first working day of 1987.

continuation following a loss of employment. *See, e.g., Becker v. Simpson Bldg. Supply Co.*, 675 F.Supp. 271, 278 (M.D.Pa. 1987); *Pabst Brewing Co. v. Anger*, 610 F.Supp. 214, 216 (D.Minn.1985), *aff'd*, 784 F.2d 338 (8th Cir.1986). Pension benefits are a contractually defined form of deferred compensation awarded regardless of the pensioner's employment status. ERISA is designed to protect those contractually defined benefits. *See* H.R.Rep. No. 533, 93d Cong., 2d Sess. 1, U.S.Code Cong. & Admin.News 1974, p. 4639, *reprinted in* II Legislative History of the Employee Retirement Income Security Act 2348, 2348 (purpose of ERISA is protection of individual pension rights); *Firestone*, 489 U.S. at 113, 109 S.Ct. at 955–56 (citing *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) and *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985)) (ERISA enacted to promote employees' interests and protect contractually defined benefits); *Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, 914 (2d Cir.), *cert. denied*, 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982) (purpose of ERISA to secure guaranteed pension payments); *cf. Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980) (purpose of termination insurance to ensure that workers who have fulfilled conditions for vesting receive defined benefits as promised). Consequently, to the extent severance pay cases are relevant at all, the law in this Circuit does not support the defendant's argument.

### b. The Advancement of Whose Interest?

The maintenance of the Fuller portion of the Plan clearly represented a significant cost to both GATX and F A Holding. F A Holding did not want to assume the liabilities of the Fuller portion of the Plan; GATX did not want to retain full liability. Indeed, the costs of employee benefits often play a significant role in negotiations of corporate sales. As one commentator has noted,

> there are costs of employee benefits that cannot be avoided. They have to be retained by the seller or assumed by the buyer. Obviously, they seriously affect the price of the business. In fact, in mergers and acquisitions, the cost of employee benefits often becomes a critical point. The seller demands more to cover costs it has discovered in its due diligence, and the buyer offers less if it sees potential liabilities.... To the extent that some of these costs are never discovered, somebody is going to get hurt.

Welch, *Employee Benefits Issues*, 10 Indus. Rel.L.J. 84, 84–85 (1988).

The costs of employee benefits associated with the Fuller sale were not assumed by the buyer nor fully retained by the seller. F A Holding would have offered less if it had to assume the Plan's liabilities; GATX would have profited less if it had to retain full liability. By terminating the employees from the Plan, and then refusing to characterize the temporary employment termination as a layoff, GATX eliminated expenses both the buyer and seller wanted to avoid. Fortunately, under the strictures of ERISA, costs cannot be eliminated (at the expense of the pensioners) in the bargaining process between the buyer and seller involved in a corporate sale.

As a result of the structure of the Fuller sale, the plaintiffs will lose money. The plaintiffs retain their vested rights to their accrued GATX pension as of the date of the sale.[15] The plaintiffs began to accrue their new Fuller pension after being re-hired by Fuller, although those benefits do not vest until after five years of service with the new Fuller Company. However, the plaintiffs' combined GATX and new Fuller pensions will amount to less than their GATX pension would have been if the sale had not occurred.[16] Significantly, if

---

**15.** This is the portion of GATX pension liability retained by the Plan.

**16.** This is particularly true for members of the Ruggeri subclass, who were coerced into accepting actuarially reduced benefits. Plaintiffs like Mr. Kotrosits suffered the most extensive loss,

the Committee had granted the applications for 75/80 pensions, the enhanced costs would have become the responsibility of GATX. The fact that GATX executives thought that F A Holding planned to operate Fuller as a going concern does not eliminate the conflict of interest because the structure of the sale still shifted the benefits costs associated with the sale to the plaintiff employees.

The structure of the sale, the termination of the plaintiff employees, and the subsequent denial of subsidized early retirement benefits shifted benefits costs associated with the Fuller sale from GATX to the employees. Thus, the denial of 75/80 pensions incident to the Fuller sale clearly benefitted GATX, the employer of the trustees. The Plan's wrong but arguably reasonable construction of the term "layoff" advanced the interests of GATX at the expense of the plaintiffs. The Plan cannot justify that determination on the basis of its benefit to the class of all participants and beneficiaries.[17] Therefore, this court holds that the trustees abused their discretion in denying 75/80 pension benefits to the plaintiff employees.

In sum, this court concludes that parties to a corporate sale of stock or assets must fully safeguard the pension rights of the corporate employees in the selling documentation. If, as in this case, the structure of the sale results in a portion of the transaction costs being shifted to the employees of the entity being sold, courts should scrutinize the corporate sale closely. Because ERISA imposes obligations on plan fiduciaries and sponsors that cannot be evaded by subterfuge, federal courts will not countenance tactics such as those employed by GATX in conjunction with the Fuller sale. Therefore, this court will order the Plan to award 75/80 point pensions to the Fuller salaried employees who met the age and years of

service requirements as of December 31, 1986. The Plan must adjust the pensions currently paid to the Ruggeri subclass members and must allow the Souders subclass members to retire retroactive to December 31, 1986. The Souders subclass members must receive the lifetime medical and life insurance benefits guaranteed to any Fuller employee who retired prior to December 31, 1986. Finally, the Plan must make the plaintiffs whole by reimbursing them for pension monies owed to them since December 31, 1986 but not paid.

Based on the foregoing findings of fact and discussion, I reach the following conclusions of law.

## III. CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction of this controversy pursuant to Section 502 of ERISA, 29 U.S.C. § 1132(e)(1).

2. This court has *in personam* jurisdiction over the parties to this action.

3. Venue is proper in this district pursuant to Section 502 of ERISA, 29 U.S.C. § 1132(e)(2).

4. The plaintiffs have established that the Plan trustees' denial of 75/80 benefits amounted to an abuse of their discretion.

5. Judgment will be entered in favor of the plaintiffs and against the defendant.

## ORDER

AND NOW, in accordance with the foregoing opinion, IT IS ORDERED that

1. The Ruggeri subclass, representing Fuller salaried employees who applied for 75/80 benefits but received only 55/15 benefits, is CERTIFIED;

2. The Souders subclass, representing the Fuller salaried employees who applied for 75/80 benefits and were not eligible for 55/15 benefits, is CERTIFIED;

because they were mere months from eligibility for 90 point pensions, an unreduced benefit available to any employee whose years of service and age add up to ninety. The termination of the plaintiffs from the GATX Plan and the Plan's discontinuance eliminated this significant liability for F A Holding and GATX. Although the plaintiffs had no vested right to the 90 point pension, this example illustrates how the termi-

nation of the plaintiffs' participation in the Plan imposed costs on the employees.

**17.** Under the circumstances of this case, this court does not credit the Plan Administrator's self-serving statement that he based his decision solely on the interests of the other participants in the Plan.

**1462**

3. The plaintiffs' request for a Declaratory Judgment that the Defendant Plan must pay 75/80 pension benefits is GRANTED;

4. The defendant Plan must award the Ruggeri and Souders subclasses 75/80 pensions retroactive to December 31, 1986;

5. The defendant Plan must allow the Souders subclass to retire retroactive to December 31, 1986 and award the Souders subclass lifetime welfare benefits available to Fuller employees who retired prior to December 31, 1986;

6. The within case is REMANDED to the Plan for actions consistent with this opinion and order.